**Cecil W. MILLER and Mildred E. Miller, Joint Tenants; Margaret L. Birchenough Testamentary Trust, Donald L. Birchenough and Walter Wright, Trustees; Ruth M. Hollinger, Individually and as Joint Tenant with Delbert Hollinger; John E. Edwards and Kermit C. Edwards, Joint Tenants; Homer Sharpe; Cecil M. Tobias and Frances Tobias, Joint Tenants; Paul F. Westrup and Ardis B. Westrup, Joint Tenants; Jay Brothers; Lyle Brothers, Individually and as Joint Tenant with Patricia R. Brothers; Alvin Engelland; Ansel Engelland; Jack Engelland and Vivian M. Engelland, Joint Tenants; Gerald N. Jones and Donna Jones, Joint Tenants; Raymond E. Tobias; Wilmor H. Oden; Raphael Roeder and Annabelle A. Roeder, Joint Tenants; Edris Edwards; Edward F. Janda and Anna Mae Janda, Joint Tenants; Harry Zwick; Arthur H. Oden; William L. Bemis and Dorothy Bemis, Joint Tenants; Roger Edwards; John Engelland; Don Engelland; Jim Hollinger; Curtis Miller; Ed Tobias; Curtis Tobias; Don Zwick; and Alvin Zwick, Plaintiffs,**

v.

**CUDAHY COMPANY, a Delaware Corporation; and General Host Corporation, a New York Corporation, Defendants.**

Civ. A. No. 77–1212.

United States District Court, D. Kansas.

Aug. 13, 1984.

Deborah Carney and Lee Turner, Turner & Boisseau, Chartered, Great Bend, Kan., for plaintiffs.

Thomas Kitch and Ron Campbell, Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., for defendants.

OPINION AND ORDER

THEIS, Senior District Judge.

This is a pollution case in which over forty landowners and lessees seek to recov-

er damages arising from salt pollution of the fresh-water aquifer beneath their lands. The case was called for a trial to the Court, sitting without a jury, on Monday, March 26, 1984. The parties presented their evidence over a span of thirty-three trial days, and all parties rested on Tuesday, May 15, 1984, at approximately seven o'clock in the evening. In the course of the trial, the Court heard live testimony from over fifty witnesses, with the plaintiffs calling approximately twenty-eight witnesses and the defendants approximately twenty-five. Some witnesses were repeatedly called to the stand. In addition, thousands of individual exhibits were introduced into evidence, including business records, demonstrative charts, maps, graphs, aerial photographs, models, rusty pipes, bottles of polluted water, and a salt block.

Following the trial, both sides submitted lengthy post-trial briefs containing suggested findings of fact and conclusions of law, with references to the voluminous record, and additional exhibits. The Court has carefully read these briefs, reviewed its trial notes, and individually assessed the credibility of the many witnesses. The Court is, after this preparation, ready to enter a judgment in this case pursuant to Rules 52(a), 54(b), and 58 of the Federal Rules of Civil Procedure.

Because the number of findings of fact is so great, the Court has subdivided those findings with several subject headings. These headings are provided solely as a convenience in understanding the organization of the findings and are otherwise without substantive significance.

## I. FINDINGS OF FACT

### A. Introduction to the Case

#### 1. Parties

1. The plaintiffs in this case are owners and lessees of rural realty in Rice County, Kansas. The vast majority of this realty is used for agricultural production, while the remainder is used for rural homesites. The plaintiffs are in lawful possession of their properties.

2. All of the plaintiffs are citizens and residents of the state of Kansas.

3. The defendant Cudahy Company [Cudahy] is a Delaware corporation with its principal place of business in Phoenix, Arizona.

4. The defendant General Host Corporation [General Host] is a New York corporation with its principal place of business in Stamford, Connecticut.

5. At the time this lawsuit was filed, Cudahy was a wholly-owned subsidiary of General Host.

6. At the time this lawsuit was filed, one of the operating divisions of Cudahy was the American Salt Company [American Salt], with manufacturing plants at Lyons, Kansas and at the Great Salt Lake in Utah.

7. After the lawsuit was filed, General Host divested itself of Cudahy, but retained American Salt as a wholly-owned subsidiary. Subsequently, General Host signed a letter of intent to sell American Salt to a third party. That agreement remains executory at this time.

#### 2. Preliminary Geography

8. The Kansas plant of American Salt is located approximately one-half mile southeast of Lyons, Kansas and approximately four miles northwest of Saxman, Kansas. American Salt has carried on operations there since 1908.

9. Two miles south of Lyons is Cow Creek, a minor tributary of the Arkansas River, that meanders in a generally southeasterly direction.

10. Below Cow Creek is the Cow Creek Valley Aquifer [the aquifer], a fresh-water-bearing stratum. The aquifer can be found between the depths of roughly ten and seventy feet, and it occupies a width of between one and two miles.

11. Like the creek above, the aquifer below flows in a generally southeasterly direction, although at a much slower rate, between one and a half to five feet per day.

In its natural state, free of the influence of pumping wells, the water in the aquifer requires about ten years to travel one mile.

12. The aquifer has well-defined borders on its sides, much like the banks of a surface creek. Cow Creek operates as a southern boundary, while a geologic formation that essentially parallels Cow Creek at a distance of one and a half to three miles serves as a northern boundary.

13. This lawsuit involves the land overlying the aquifer between the American Salt plant to the northwest and Saxman to the southeast. This land is owned or leased by the plaintiffs. The water in the aquifer passes under the American Salt plant before it passes under the plaintiffs' lands, and is heavily contaminated with salt.

### 3. Basics of Salt Mining

14. The natural salt formation exploited by American Salt lies approximately 725 feet below the ground surface in a stratum 280 feet thick. Interspersed within the salt stratum are layers of shale of various thicknesses.

15. Two methods are employed by American Salt to get this salt to the surface. The first method utilizes a shaft mine and involves sending workers down into the salt stratum to physically remove solid salt and transport it to the surface.

16. The second method utilizes a matrix of brine wells and involves injecting high-pressure fresh water into the salt stratum, allowing the water to dissolve the salt, recovering the resulting brine, and evaporating it to produce solid salt. This method is called solution mining.

17. Until 1979, American Salt drilled its wells as individual brine wells. An individual brine well is so constructed that fresh water may be injected into and brine withdrawn from the salt stratum through the same well.

18. Three steps are involved in drilling and casing an individual brine well. First, a relatively shallow surface hole is drilled and an 8⅝ inch surface casing set into that hole. Second, a production hole is drilled to the bottom of the salt stratum, and a 5½ inch production casing set into that hole so that the casing ends near the top of the salt stratum. Third, a 2⅜ inch production tubing is suspended inside the production casing so that the tubing ends near the bottom of the salt stratum. This creates two pathways into the salt stratum: one inside the tubing and the second between the tubing and the production casing. The space between the tubing and the production casing is called the annulus.

19. In the so-called "normal mode" of solution mining, fresh water is injected through the tubing to the bottom of the salt stratum. This high-pressure water dissolves the salt and forces the resulting brine, which is heavier than fresh water, to flow upward through the annulus to the surface. Such operation washes a compact spherical cavity deep in the salt stratum, and produces a modest brine flow of ten to fifteen gallons per minute [gpm] from a mature well.

20. In the so-called "reverse mode" of solution mining, fresh water is injected through the annulus and brine is withdrawn from the tubing. Such operation washes a very large, shallow, trumpet-shaped cavity on the top of the salt stratum, but produces a substantially greater brine flow of forty to forty-five gpm from a mature well.

21. American Salt's individual brine wells are situated approximately 400 feet apart. Long-continued operation of these wells in the normal mode, or substantially shorter operation in the reverse mode, can cause the cavities in the salt stratum to wash together. When this occurs, the wells are said to be interconnected. Four large areas of interconnection, involving almost all of American Salt's individual wells, have developed in both the original brinefield [the old brinefield] and the 1959 individual-well addition [the new brinefield].

22. In 1979, American Salt switched to the gallery method of solution mining. To create a gallery, three wells are drilled and

surface and production casing is installed, but no production tubing is installed. Brine is then injected into the center well under pressure great enough to lift the 800 feet of overburden and to create a fracture in the salt stratum. This procedure is called a hydrofrac. If the hydrofrac is successful, the fracture will pass through the bore holes of the two outside wells and permit a channel to be washed between them. Brine is used to create the fractures because it will not rapidly wash a channel if the fracture goes astray, as they are wont to do. Once a connection between the target wells is established, fresh water is injected through the well at one end of the gallery and brine is withdrawn from the well at the other end of the gallery. This method produces large quantities of brine and avoids the numerous maintenance problems associated with production tubing, as no production tubing is ever installed in any of the gallery wells.

23. Regardless of the method by which the brine is produced, it is collected at the wellhead and transported to the main plant via buried pipelines. The brine is then processed into solid salt. The design of the processing equipment is such that saturated brine—that is, water holding the greatest possible amount of salt in solution—is necessary for efficient operation. Saturated brine contains two and a half pounds of salt per gallon, or about 250,000 parts per million.

24. The brine was originally processed into solid salt in devices called granier pans. The granier pans were large flat open-topped tanks with steam coils in the bottom. Brine was dumped into them and boiled until the increasing concentration caused salt to crystalize and fall out of solution. The salt crystals were then scraped up by paddlewheels and transported by conveyor belt to a drying room, where the crystals were dumped on a slatted floor and excess brine was permitted to drip through, directly onto the ground. American Salt's granier pan operation continued until 1962, when demand for granier pan salt ceased.

25. In 1928, American Salt installed its first set of vacuum pans. Vacuum pans are very large upright closed tanks in which brine is boiled and continuously circulated. The resulting steam is withdrawn and condensed, creating a partial vacuum inside the pans. Steam withdrawal and brine input are carefully balanced, and crystalizing solid salt is removed from the bottom of the pans. Vacuum pan salt is dried by machines with heat.

26. Circulation in the vacuum pans is critical. If circulation of the salt slurry inside the pans is lost for any reason, the crystalized salt inside the pans settles to the bottom and sets up like cement, completely plugging the system. Disassembly and manual cleaning of the pans, a lengthy and expensive process, is then required before production can be re-established.

27. A second set of vacuum pans was installed in 1970–71. The 1928 pans were taken out of service in 1979, when a third set of pans was installed.

28. Effluent is produced by American Salt's operations. In the early days this effluent was simply dumped into the creeks. Attempts to reuse the effluent in the solution mining process were hampered by the large amount of solid matter and sulfates contained in it. By 1936, a settling pond was in use to remove the solids from the effluent. Part of the effluent was then recycled.

29. In 1968, a deep disposal well was constructed for the plant effluent. The disposal well conducts the effluent into a porous formation called the Arbuckle, found at a depth of approximately 4000 feet. Because the Arbuckle can be plugged up by solids, it is necessary to remove the solids from the plant effluent before it is placed into the disposal well. American Salt removes the solids from its effluent by running the effluent through settling cavities. The settling cavities are nothing more than the inactive large caverns created when the individual brine wells interconnected. When American Salt was conducting active solution mining in the new brinefield, the interconnected ca-

verns in the old brinefield were used as the settling cavity. When American Salt switched to the gallery method of production, the interconnected caverns in the new brinefield were used as the settling cavity.

30. Settling cavity operation involves injecting the collected effluent into an old brine well at one end of an interconnected cavern and withdrawing the effluent from a second old brinewell at some distance from the injection well. The time required for the effluent to move through the cavern allows the solids contained in the effluent to settle out by gravity. There are two significant consequences. First, the size of the interconnected cavern continues to increase, because the effluent is not saturated brine and therefore dissolves solid salt from the salt stratum as it passes through the cavern. Second, the interconnected cavern, and every single well that penetrates that cavern, are subjected to the plant pressure used to inject the effluent into the interconnected cavern. The interconnected caverns are of immense size and contain approximately half a billion gallons of brine and effluent.

### 4. History of the Litigation

31. The original complaint in this case was filed on May 31, 1977. That document alleged that the plaintiffs had been permanently damaged and sought recovery at the rate of $450 per acre, representing the difference in value between dry land and land with good water under it, along with punitive damages and equitable relief.

32. After an arduous discovery phase, the pre-trial order was filed on March 9, 1982. That document, by its own terms, superceded the pleadings in the case. The plaintiffs contended that the defendants' activities "constitute a continuing nuisance, trespass, and damages," Dk. No. 309, at 4.

33. After the pre-trial order was filed and after the vast majority of the discovery in the case was completed, the defendants moved for partial summary judgment in an extremely lengthy motion filed on November 2, 1982. Although several specific grounds for partial summary judgment

were urged in relation to several specific parcels of land, the main thrust of the motion was the defendants' assertion that that plaintiffs were totally barred from any recovery by the two-year statute of limitations found at K.S.A. § 60–513.

34. After heavy briefing from all parties, this Court entered a lengthy Order and Opinion on June 21, 1983, see Miller v. Cudahy Co., 567 F.Supp. 892 (D.Kan.1983). This Court squarely rejected the statute of limitations argument, holding that the apparently continuing nature of the pollution emanating from the American Salt facility was sufficient to categorize the plant as a continuing nuisance causing temporary damages and "giving rise over and over again to causes of action to recover for the injuries sustained in the statutory period immediately preceding the filing of the suit, at least so long as some acts of pollution continue," Miller, 567 F.Supp. at 906.

35. The case was called for a bench trial on March 26, 1984, and submitted to the Court for decision on May 15, 1984.

### B. Responsibility for Pollution

36. There is no credible evidence that indicates that any of the sale presently polluting the aquifer came from any source other than American Salt. The testimony offered by the defendants suggesting that salt pollution was contributed by oil and gas operations or by other salt mining companies in the 1940s is expressly found to be incredible.

37. All of the salt presently dissolved in the aquifer escaped from the property and control of American Salt. The existence and extent of the salt pollution has been shown by the chloride readings taken from a limited system of monitor wells installed by the state of Kansas in the summer of 1968 [the state monitor wells], see plaintiffs' exhibit 25, and from a series of test holes drilled and sampled by Darrell Clarke in 1978, see plaintiffs' exhibit 120, 121.

38. The salt presently dissolved in the aquifer reached the groundwater by two separate paths. A minority of the salt

reached the aquifer by being spilled on the surface and percolating downwards. The majority of the salt reached the aquifer by direct subsurface leaks from the solution mining and settling activities.

### 1. Surface Pollution

39. Salt reaching the groundwater through surface spills and percolation took two forms. Some of it was spilled or dumped on the surface as solid salt. The remainder was spilled on the surface as liquid brine.

40. Solid salt was intentionally dumped on the surface at two locations: reject rock salt was dumped north of the shaft mine mill area at the north end of the plant site, and broken salt blocks and spilled salt from broken bags and packages was dumped in the south dump at the south end of the plant site. Salt dumped on the surface was dissolved by rain and eventually percolated directly into the groundwater. The rock salt in the north dump was leveled and covered with clay in 1958, but was subsequently dissolved by floodwaters in 1962. Tons of salt were percolated into the groundwater from the south dump until 1979, when the remaining 1462 cubic yards of salt were excavated and properly incapsulated under clay and asphalt at the old north dump site.

41. Liquid brine has been dumped and spilled on the surface of the American Salt facility since the inception of operations there in 1908. Surface brine spills originated primarily from four sources: (1) operation of the granier pan system; (2) operation of the vacuum pan system; (3) surface storage of brine and effluent; and (4) leaks from surface lines and wellheads.

### (a) Granier Pan Operation

42. Operation of the granier pan system was extremely messy and contributed countless tons of salt to the plant's surface pollution in the nearly fifty-five years the system was in operation. Absolutely no consideration was given to the pollution characteristics of this system in either its design or operation. Brine escaped from every subpart of the granier pan system, and great quantities of brine were knowingly and intentionally permitted to drain onto the ground during the drying process. The quantities of brine permitted to escape were so great that large ponds of brine often formed at the southeast corner of the plant site, in accordance with the natural drainage properties of the area.

43. In addition, surface pollution was caused when the granier pans were washed out. In the course of normal operations, sludge would form on the steam coils in the bottom of the granier pans. This sludge was removed by dumping the brine in the pans onto the ground, flushing the pans with fresh water, and dumping the wash water onto the ground. This washout operation was done at intervals ranging from five to six weeks, and was done without consideration of the pollution consequences.

### (b) Vacuum Pan Operation

44. The vacuum pan system was a major improvement over the granier pan system from a pollution standpoint. Because the vacuum pan system is enclosed and uses machines and heat to dry the solid salt, the considerable pollution caused by escaping brine in the conveyor belt and drip-drying stages of the granier pan system was completely eliminated. This is not to say, however, that the vacuum pan system did not contribute substantially to American Salt's surface pollution.

45. Like the granier pans, the vacuum pans accumulated sludge and debris during normal operation and required routine washouts. Initially the vacuum pans were washed out on a daily basis. The washout period has been extended, by gradual steps, to about two weeks. Considerable pollution was caused in the past by the escape of these wash waters.

46. The major source of vacuum pan surface pollution resulted from what the defendants liked to call "upsets." The pans experienced an upset whenever circulation of the salt slurry inside them was

lost. Circulation was lost whenever either the water or electrical supply to the plant was interrupted. Such interruptions were perfectly forseeable and occurred up to eight times per year.

47. When circulation was lost, the crystalized salt inside the pans would settle unless the contents of the pans were dumped. Allowing the salt to settle would plug the system, and unplugging the system required forty-eight hours of emergency work and cost up to $60,000. In addition, the plant was shut down and production was lost when the pans were plugged. It was, therefore, routine practice to dump the pans during upsets.

48. Dumping the pans prior to September of 1977 was an ecological disaster. The pans are very large devices, standing about sixty feet tall and each containing 16,000 gallons of super-saturated brine. During normal operation, input and outtake are balanced so as to maintain twenty tons of solid salt in circulation in each pan. Because the pans are sequentially connected to the steam supply and are served by the same electrical and water systems, upsets usually require dumping all four pans at once. A single upset therefore results in the dumping of almost eighty tons of solid salt and tens of thousands of gallons of super-saturated brine.

49. Prior to September of 1977, the only thing that stood between the environment and the massive quantity of salt dumped during upsets was the eight-inch concrete curb around the perimeter of the floor of the vacuum pan building. This curb originally did not extend across the doorways of the building, and therefore did not form a continuous eight-inch barrier. Although the curb was usually sufficient to restrain the two to three tons of salt intentionally purged from the vacuum pans each day to remove unwanted salt lumps, it was utterly and completely inadequate to handle the torrents created during upsets. The vast majority of the material dumped during upsets would simply flood out of the vacuum pan building and run across the ground, escaping from American Salt's control and into the environment. The pans were dumped during upsets with full knowledge of, and without regard to, the pollution consequences.

50. American Salt finally addressed the upset problem with the construction of an emergency catch basin, which became operational in September of 1977. Far from a highly technological device, the emergency catch basin is basically an empty pond. A swinging gate was installed in the normal discharge path from the plant. The gate is controlled by a sensor in the effluent flow, and the gate swings from one position to another when the salt content of the effluent reaches a predetermined level. Effluent of low salinity escapes from the plant in the normal path, while effluent of high salinity, such as that produced during upset dumps, is directed by the gate into the emergency catch basin, where it is simply held. Once the upset has passed, the contents of the emergency catch basin are pumped back into the plant and reused. Such a system could have been constructed decades earlier.

51. Upset dumps of the vacuum pans prior to the installation of the emergency catch basin occurred most recently in the summer of 1976 and in the early part of 1977.

### (c) Surface Storage

52. Surface pollution was also caused by American Salt's practice of storing and holding liquid brine and effluent in unlined surface ponds, from which the brine and effluent could percolate into the groundwater.

53. The first such source was constructed in the mid-1930s and is called the settling pond. Located in the northern part of the old brinefield, the settling pond was used as recently as 1968. Plant effluent was simply dumped into this pond, and whatever fluids failed to evaporate or to percolate downwards through the bottom of the pond and into the groundwater ran out of the pond and escaped from American Salt's control. During the years it was in use, the settling pond filled with carbon-

ates and sludge. The pond is easily visible as a white shape on the aerial photographs introduced into evidence, *see* defendants' exhibit X-15.

54. The second such source was constructed in late 1972 and is called the recycle pond. Located in the new brinefield, the recycle pond is still in use today as a surge tank, of sorts, for the solution mining system. When built, the recycle pond was unlined, and permitted the high-salinity fluid stored in it to percolate into the substrata. In February of 1974, a hypalon liner was installed in the recycle pond to isolate the fluids stored in it from direct contact with the ground. The intent of the liner was defeated, however, by intentionally storing so much fluid in the pond that the surface level of the fluid was higher than the top of the liner. The recycle pond was operated above the liner almost continuously until 1978, without regard to the pollution consequences.

### (d) Line and Wellhead Leaks

55. Because the solution mining system operates under considerable pressure, integrity of the above-ground brine lines and the brine connections on the wellheads is critical in preventing surface spills of saturated brine. Instead of maintaining an aggressive program of preventative maintenance to insure that integrity, however, American Salt operated its plant and equipment to failure. Lines and wellheads were repaired after they started leaking, instead of being maintained to prevent their leaking. In the process, saturated brine regularly escaped onto the surface of the ground, where it could percolate into the substrata. Some seventy spills releasing over 652 tons of salt onto the surface were documented between 1976 and the time of the trial. Spills from the wellheads, caused by leaks and careless maintenance practices, were so constant that salt scars formed on the surface around each well. These scars are readily visible on aerial photographs of the brinefields, *see* defendants' exhibit X-15.

56. These events occurred with sufficient regularity, and were of sufficient duration, that the plaintiffs were able to preserve evidence of them photographically. Burst hoses on the wellheads were particularly spectacular, sending plumes of saturated brine dozens of feet into the air. Once such brine penetrated the surface of the ground, it had escaped from American Salt's control.

### 2. Subsurface Pollution

57. The aquifer underlying the land at issue in this lawsuit is carrying a burden of somewhere between 150,000 and 325,000 metric tons of dissolved salt. Egregious as American Salt's surface pollution has been, that surface pollution alone could not have contributed so massive a quantity of salt to the groundwater. Because the evidence clearly showed that all of the salt presently dissolved in the aquifer escaped from the property and control of American Salt, and because the surface pollution alone was insufficient to produce the pollution load carried by the aquifer, this Court has carefully scrutinized the evidence relating to the subsurface aspects of American Salt's operation.

58. Subsurface pollution of the aquifer occurred primarily through two activities: active solution mining and settling cavity operation. In either case, a lack of casing integrity in one or more brine wells provided the mechanism whereby saturated brine could be injected under pressure directly into the aquifer.

### (a) Proper Brinewell Construction

59. Current solution mining practice requires that, to prevent all possibility of pollution to underground water-bearing strata, a surface casing be set to a depth of about 200 feet and cemented back to the surface. Cementing a surface casing back to the surface involves forcing cement placed inside the surface casing to flow upwards into the space between the outside of the surface casing and the outside of the bore hole. The surface casing protects the aquifer by interposing the steel casing it-

self and a layer of cement between the aquifer and the working bore of the well. As additional protection, the production casing, which extends from the surface to the top of the salt stratum, is likewise cemented all the way back to the surface. This adds a second steel casing and a second layer of cement between the aquifer and the working bore of the well, and has the critical function of totally enclosing the surface casing in cement. The surface casing is thereby completely isolated from both the fresh water of the aquifer and the brine from the solution mining process. Rusting of the surface casing, if it occurs at all, occurs very slowly.

60. To emphasize this important point, the following description is offered of a properly completed casing system in a brine well, as viewed from the top. First, there is the edge between the earth and the bore hole. Second, there is a layer of cement. Third, there is the steel surface casing. Fourth, there is another layer of cement. Last, there is the steel production casing. The elements of the casing system form four concentric circles of alternating cement and steel. *See* defendants' exhibit ZZ.

61. When the time comes to plug such a well, the first step is to set a device known as a bridge near the bottom of the production casing. The bridge acts like a cork and completely stops up the production casing. Special tubing is then inserted inside the production casing all the way to the bridge. Cement is then injected at the bottom, through the special tubing, until cement appears at the surface. The tubing is then withdrawn, and additional cement added as necessary, until the tubing is out of the well and the production casing is completely filled with cement. No leakage can occur from a well plugged in this manner.

62. These techniques, and their superiority over other methods, have probably been known since the 1920s, and have certainly been known since the 1940s.

### (b) Early American Salt Brinewell Construction

63. American Salt first cemented surface casing back to the surface in well 25, completed in August of 1943. Production casing was first cemented back to the surface in well 32, completed in September of 1951. Prior to these wells, American Salt used methods of well construction that are inferior by modern standards.

64. In wells 1 through 25, a drive pipe was substituted for cemented surface casing. A drive pipe, as the name implies, is simply driven into the bore hole. Theoretically, the drive pipe should be driven slightly into the impermeable rock layer beneath the aquifer to make a seal of sorts. American Salt installed between sixty and 101 feet of drive pipe in these wells. Drive pipes in the sixty to 100 foot range were used intermittently with cemented production casing as late as 1964, in well 45.

65. Some of the wells with drive pipes— e.g., well 5—did not have production casing to the top of the salt. Well 5 had less than 300 feet of casing. From 300 feet to the top of the salt stratum, the well was an unlined and open hole.

66. No records were kept concerning the drilling or casing of wells 1–4.

### (c) Subsurface Pollution from Solution Mining

67. If integrity was lost in the production casing and the surface casing or drive pipe of an active brine well, the pressure under which the solution mining took place was sufficient to force saturated brine out of the casing system and into the groundwater. Objective evidence of such pollution was nearly impossible to obtain, however, because the pollution took place underground with no surface manifestations. Had American Salt metered the fluids going into and coming out of its brinewells, such losses might have been detected. American Salt did not meter its fluids.

68. Despite these difficulties, objective evidence of one instance of subsurface pollution from a brinewell was introduced. In

October of 1977, a continuous rushing noise was heard emanating from well 34, which had been inactive for about two years but had not been plugged. The pressure of the solution mining process going on in the new brinefield was alternately raised and lowered, and well 34 showed corresponding pressure changes. This proved that well 34 was interconnected with the active brinefield. Further tests were then run that indicated the presence of an opening between the aquifer and the well at a depth of approximately 70 feet. Well 34 was thus acting as a conduit between the active brinefield and the lowest level of the aquifer. Calculations revealed that the opening was permitting 250 gallons of brine per minute to escape into the groundwater, and the well was not plugged for nearly two weeks after the leak was discovered. At a minimum, 6750 tons of salt entered the groundwater during this occurrence. There is no way to determine how long the well leaked before it started making enough noise to call attention to itself.

### (d) Subsurface Pollution from Settling Cavity Operation

69. If integrity was lost in any well that penetrated an interconnected cavern being used for a settling cavity, the pressure used to inject and recover the plant effluent from the settling cavity was sufficient to force the effluent out of the casing system and into the groundwater. Once again, objective evidence of such pollution was nearly impossible to obtain because of the hidden nature of the pollution.

70. American Salt has used three separate settling cavities. The first was located in the northern part of the old brinefield (wells 12, 12A, 18, and 20) and was used intermittently between 1958 and 1973. The second was located in the southern part of the old brinefield (wells 35 and 36) and was used between 1973 and 1981. The current settling cavity is located in the new brinefield (wells 59 and 66) and has been used since 1981.

71. The first settling cavity was a major source of subsurface pollution. The interconnected cavern utilized as the first settling cavity formerly comprised at least sixteen individual brinewells, which had completely interconnected. Included in the interconnected cavern were the oldest brinewells constructed by American Salt, none of which had cemented surface casing. The oldest wells penetrating the cavern dated from 1908, while the newest wells dated from 1933. Several of the wells were reworked in 1957, prior to the initial use of the settling cavity. When first put into use, the cavity had integrity.

72. Within four years of the activation of the first settling cavity, salt appeared in the well water and in the sand pits of a commercial redi-mix concrete plant located immediately adjacent to the old brinefield on the west.

73. Reference to leaks in this settling cavity first appear in the plant records in 1971, see plaintiffs' exhibit 218.5. In early 1973, a major leak in the casing of one of the interconnected wells forced American Salt to abandon this settling cavity permanently.

74. Investigations of the condition of the wells comprising the first settling cavity, conducted after the cavity was removed from service, revealed that many of the wells were in very poor condition. For example, well 3, during the entire period of operation of the first settling cavity, was only plugged to the extent of having a piece of wood hammered seven feet into the casing. Well 14, which supposedly had 666½ feet of casing installed in it in 1930, was found to be an unlined and open hole, completely without casing, below eighty-two feet. While the defendants cannot be blamed for failing to use 1970s methods when drilling, casing, and plugging these old wells in the 1910s—1950s, the continued use of these wells as part of the settling cavity, without any attempt to modernize them in accordance with the latest plugging technology, is blameworthy.

75. Operation of the first settling cavity contributed very significant amounts of

pollution to the aquifer. It is impossible to ascertain with any precision the quantity of salt actually lost into the groundwater from this source.

76. The second settling cavity was also a major source of subsurface pollution. In May of 1979, an effluent leak of twenty to thirty gallons per minute was noted at an open nipple on the drive pipe of well 35, which was one of the wells in the settling cavity. The flow was stopped by driving a wooden plug in the nipple, so that the leak would not be apparent at the surface. Additionally, a hole was discovered in the casing of the well at a depth of approximately six feet. This hole was subsequently patched, but the well itself was not plugged until 1982.

77. Operation of the second settling cavity contributed significant amounts of pollution to the aquifer. It is impossible to ascertain with any precision the quantity of salt actually lost into the groundwater from this source.

78. There is no credible evidence that the current settling cavity has contributed significant amounts of pollution to the aquifer since 1981.

### (e) Additional Subsurface Pollution

79. A final source of subsurface pollution is the buried brine and recycle lines used to transport water from the plant to the brinefield and brine from the brinefield to the plant. Several of these lines are constructed from transite pipe, a non-metallic and fairly brittle asbestos and epoxy product. Transite pipe must be bedded in sand for satisfactory performance, but American Salt disregarded the manufacturer's recommendations and failed to use sand bedding on several transite pipelines. As a consequence, these lines crack and separate during the changes of the seasons, and permit their contents to escape into the surrounding soil.

80. The leakage of these underground lines is a continual problem. A major pipeline break even occurred during the trial, releasing significant amounts of high-chloride water that flowed into an unlined ditch

where it was free to percolate into the substrata. Although American Salt took prompt remedial action by attempting to suck up the salty water and then dilute the remainder, such after-the-spill efforts cannot possibly recapture all of the escaped salt. Such after-the-spill efforts are, however, substantially less costly than digging up the lines and properly bedding them in sand to prevent leaks in the future.

### 3. Continuing Nature of the Pollution

81. The defendants insist that the salt plant has caused no significant pollution since 1975, and probably none since 1965. The evidence adduced at the trial, however, along with the rational inferences from that evidence, showed that it was more probable than not that the salt plant contributed genuinely and unequivocally significant amounts of new pollution to the aquifer on a continuing basis at least until the second settling cavity was taken out of service in 1981. The evidence and the rational inferences from that evidence further showed that, although very major improvements in the pollution characteristics of the plant have been made since this suit was filed in 1977, the plant nevertheless continues to add legally significant amounts of pollution to the environment on a regular and recurring basis up to the present time.

82. In addition, there is no dispute that the pollution itself, as opposed to the events by which the pollution is introduced into the environment, is of a continuing nature. Nowhere within the plant's sphere of influence can the groundwater be used for irrigation purposes—including the areas immediately adjacent to the plant, where one would expect the influx of unpolluted water from upgradient to have displaced the salty water if all active pollution had actually been halted ten to twenty years ago.

### C. Damages
#### 1. Loss of Crop Profits

83. Salt concentrations of over 30,000 parts per million have been recorded in

water drawn from the aquifer. Concentrations of only 250 parts per million are sufficient to make water taste salty and to render it unfit for domestic and irrigation use.

84. Natural rainfall in Rice County is insufficient for corn to be grown there. Thus, only dryland crops, such as wheat and milo, may be grown on non-irrigated Rice County land.

85. The land involved in this lawsuit could be irrigated but for the salt pollution of the aquifer. The climate, soil quality, terrain, and aquifer characteristics make this land ideal for growing irrigated corn, but for the pollution of the aquifer. The plaintiffs would have earned a better return in the past, and would earn a better return in the future, by growing irrigated corn on this land. The growing of irrigated corn has been the highest and most profitable use of this land under the state of the irrigation art during the pendency of this case. The plaintiffs cannot grow corn on this land solely because of the salt pollution of the aquifer.

86. Because the salt in the aquifer escaped from the control of the defendants, and because the salt in the aquifer is the only reason why irrigated corn cannot be grown on the plaintiffs' lands, there is a direct causal connection between the defendants' polluting acts and the plaintiffs' inability to grow irrigated corn.

87. Because irrigated corn would be more profitable for the plaintiffs than the dryland crops they are forced to grow because of the salt pollution of the aquifer, the plaintiffs have been damaged by the pollution to the extent of these lost crop profits.

88. The plaintiffs have done nothing to increase or exacerbate their damages. The plaintiffs have, however, taken reasonable steps within the bounds of common sense to minimize their damages. Rather than allowing their lands to lie fallow, the plaintiffs have placed their property into dryland agricultural production, growing unirrigated wheat and milo crops of considerable value each year. While other activities by the plaintiffs to minimize damages are conceivable on the facts of this case—such as selling the land involved in this lawsuit and buying whatever other irrigable farmland they might be able to find for sale, or constructing a pipeline to bring in fresh water—none of those activities could have been undertaken with a reasonable effort and without undue risk, expense, or humiliation. The plaintiffs took all the reasonable steps that were available to them to minimize their damages.

89. Computation of the plaintiffs' damages caused by their loss of crop profits rests on the intricate interrelationship of many factors, including the value of the wheat and milo crops actually grown; the sale value of the corn crops that would have been grown; the yields to be expected from the corn crops; the number of acres that would have been devoted to irrigated corn crops; the expenses of buying, setting up, and operating the irrigation systems; the inherent expenses of raising corn as opposed to wheat or milo; and the proficiency of the individual farmers. Expert testimony was offered by both sides on these factors, and the plaintiffs themselves testified on those factors especially within their own knowledge.

90. Because of the number of potential variables, the estimates of the damage covered a very wide range. The width of the range is attributable to the diversity of the sources relied on by the various witnesses to provide concrete numbers to plug into the damage formula. The formula itself remained fairly constant, namely to subtract from the *net* value of the lost corn production the *net* value of the wheat and milo crops actually grown.

91. The plaintiffs' expert witness on this subject, Tom Dechant, calculated the damages by six different methods using three basic variables: yields per acre, prices per bushel, and production costs per acre. Dechant's analysis concluded that the accumulated damages of all of the plaintiffs for the entire nine-year period from 1975 to 1983 ranged from a low of $1,504,869 to a high of $11,500,620. The

low figure relied on several independent sources for numbers for the three variables, while the high figure used the expected yield figures stated by another of the plaintiffs' expert witnesses.

92. Plaintiff Cecil Miller also opined on the subject of damages by supplying his own numbers for the variables. Miller's analysis concluded that the accumulated damages of all of the plaintiffs for the nine-year period ranged from $7,349,819.40 to $11,108,997.90.

93. The defendants' expert witness on this subject, Donald Pretzer, performed an analysis identical to two of Dechant's methods but utilizing different numbers for the production costs per acre. Pretzer was involved in the publication of the production-costs-per-acre figures used by Dechant, and Pretzer felt Dechant had misapplied some of the figures. As computed by Pretzer with his corrected figures, the accumulated damages for all of the plaintiffs for the nine-year period ranged from $943,773 to $1,019,524.

94. Pretzer also performed a completely different type of damage analysis in which he calculated diminution in the rental value of the plaintiffs' lands caused by the destruction of the irrigation potential of those lands. This analysis produced an accumulated damage figure of $715,260.70.

95. The determination of the actual amount of lost profits suffered by the plaintiffs is heavily dependent on the Court's assessment of the credibility of the various witnesses who testified on this subject and the credibility of the sources consulted by those witnesses. The amount by which the bias and interests of the witnesses could affect the calculation is well-demonstrated by the ten-million-dollar difference between Miller's highest figure and Pretzer's lowest figure.

96. After carefully considering the credibility of the witnesses and the many documents introduced into evidence to support their conclusions, this Court finds that Miller's supporting numbers are overly optimistic and that his damage figures are, therefore, significantly overstated. The

Court also finds that Pretzer's supporting numbers are overly pessimistic and that his damage figures are, therefore, significantly understated. The Court further finds that Dechant's testimony concerning the first two of his six methods of calculating the damages to be the most credible offered to the Court on the subject, and to be the most credibly supported by detached and unbiased data, with one minor exception. Dechant proceeded on the assumption that 3,108 acres would be placed in irrigated corn were it possible to grow irrigated corn on the plaintiffs' lands. The Court finds this figure to be unsupported by the evidence, and further finds that a maximum of 2,800 acres would be placed in irrigated corn were it possible to grow irrigated corn on the plaintiffs' lands. Correcting Dechant's figures to reflect losses on only 2,800 acres, his first method reveals an accumulated loss of approximately $3,125,000; while his second method reveals a loss of approximately $2,995,000.

97. The Court therefore finds that the plaintiffs have lost crop profits in an aggregated amount of $3,060,000 during the years 1975 through 1983, inclusive, as a direct and proximate result of the pollution escaping from the defendants' salt plant.

### 2. Consequential Damages

98. Several of the plaintiffs have alleged that they have been damaged by having to replace their plumbing and various water-using appliances such as dishwashers, washing machines, hot water heaters, and septic tanks. The plaintiffs failed, however, to introduce credible evidence that would allow this Court to determine the existence of a causal connection between the defendants' pollution and the necessity of these repairs, particularly with regard to apportioning the demise of these appliances to either the expiration of their normal service lives or to accelerated decay brought on by the salty condition of the water. The plaintiffs also failed to introduce credible testimony that would allow the Court to determine with certainty when some of these expenses were incurred.

The plaintiffs affirmatively allege that some of the repairs were performed as long as thirteen years ago. For these reasons, the Court is unable to discern, with reasonable certainty, the amount of consequential damages suffered by these plaintiffs in the form of damage to plumbing and appliances.

99. In contrast, credible evidence was introduced to demonstrate a causal connection between the salt pollution and physical damage to the domestic water wells of plaintiffs Ed Tobias and Lyle Brothers. Tobias was forced to drill a new domestic well at a cost of $5000, while Brothers was forced to redrill two wells at a cost of $1000 each.

100. Brothers likewise introduced testimonial evidence showing damage to his dairy operation. Brothers owns fifty to sixty dairy cows, and those cows produce less milk and require more feed because of the high salt content of the dairy barn water supply, which is derived from the polluted aquifer. After assessing the credibility of this testimony and examining the figures provided by Brothers, the Court finds that his dairy operation has been damaged in an aggregate amount of $42,500 during the years 1975 to 1983, inclusive, as a direct and proximate result of the pollution escaping from the defendants' salt plant.

### 3. Surface Damage

101. Brine occasionally escaped from the defendants' control and physically washed over some of the plaintiffs' land. Such invasions left a salt residue in the soil that prevented normal agricultural production. Plaintiff Delbert Hollinger testified that eight acres owned by him had been damaged in this way, while plaintiff Cecil Miller testified that twenty-five acres of his land and six acres owned by the Birchenough Trust and farmed by Miller had been damaged in this way. The testimony was conflicting on how many acres were affected and the severity of the damage to the acres that were affected.

102. After assessing the credibility of the witnesses and examining the figures provided by the parties, the Court finds that eight acres farmed by Hollinger and thirteen acres farmed by Miller have suffered surface salt damage that manifests itself by a total loss of production for the dryland crops planted on those acres.

103. The Court further finds that the damage wrought by this total loss of production is the net value of the dryland crops that could be grown in a half wheat, quarter milo, quarter fallow rotation on this land. Hollinger has therefore been damaged in an aggregate amount of $3138.48, and Miller in an aggregate amount of $5100.03, during the years 1975 through 1983, inclusive, as a direct and proximate result of the pollution escaping from the defendants' salt plant.

104. The Court further finds that restoration of this land would cost $65,000 at a price of $5000 per acre.

### 4. Pipeline Trespass on Cecil Miller's Land

105. The defendants buried a pair of pipelines that run, in part, under land owned by Cecil Miller. Originally, one pipeline carried recycle fluids to the brinefield from the plant and the other pipeline carried brine to the plant from the brinefield. The brine pipeline has since been abandoned, but remains under Miller's land. The recycle pipeline is still in use by the salt plant.

106. Miller failed to introduce credible evidence showing that he suffered actual damages because of the presence of the pipelines under his property. Damages for leaks from these pipelines are, of course, subsumed in the damages for lost crop profits and surface damage.

### 5. Stress, Aggravation, and Mental Anguish

107. Although the plaintiffs claim to be entitled to money damages for the stress, aggravation, and mental anguish they have suffered because of the pollution of their land and groundwater, they utterly failed

to introduce any credible evidence to support such an award. In fact, the plaintiffs have failed to place any value on these supposed damages, even in their post-trial submissions. While the Court has no doubt that the plaintiffs have suffered stress and aggravation, and would be surprised if the plaintiffs were not anguished at discovering the enormity of the damage caused by the defendants' salt plant, the Court is unable to discern, with reasonable certainty, the monetary value of such emotions.

108. The plaintiffs have agreed to equitably apportion non-specific damages awards among themselves, as their interests as landowners and lessees may appear.

### D. Punitive Damages

109. The corporate philosophy of American Salt's management, and of past president Otto Rueschhoff in particular, has consistently been one of increasing both production and profits while minimizing expenses unrelated to increasing production and profits. Although there is nothing inherently suspect about a corporation's striving for the maximum return for its shareholders, such activity carries the potential for causing injury to the rights of innocent third parties if carried to a socially unacceptable extreme.

110. Solution mining of underground salt is an activity with a very high potential for grievous harm to the environment and the rights of surrounding landowners if not performed with a high degree of care and a well-developed sense of social responsibility. Even though salt is beneficial to man and, in fact, is necessary for his survival, it becomes a deleterious substance when it invades the fresh water supplies of the people. Fresh water contaminated with salt becomes a poison to man, beast, and plant alike.

111. Salt is a particularly insidious pollutant of fresh water because it is very highly soluble, it has the ability to remain in solution indefinitely, and it is difficult to remove from solution once it has entered it.

112. Even though American Salt's management was fully cognizant of these properties of salt and the havoc that would be wreaked by massive salt pollution of the aquifer, they reached a conscious and reasoned business decision to maximize profits at the expense of the necessary and required preventative maintenance of their complex physical plant and equipment. It was perfectly foreseeable to American Salt's management—and was, in fact, foreseen by them—that deterioration of the physical plant and equipment would occur, and would result in pollution of the environment if not corrected by aggressive routine maintenance. The physical plant and equipment were, nevertheless, allowed to deteriorate to the point where incidents of pollution were commonplace, everyday occurrences.

113. The record is rife with specific instances of pollution caused by the deterioration of the physical plant and equipment. Brine lines that sprung leaks were repaired with clamps instead of being replaced, even if "the line [was] so thin that it [was] almost impossible to put a clamp on it that [did] not leak a little brine," plaintiffs' exhibit 206.10. Hose breaks on the wellheads led to dramatic geysers of saturated brine. Despite the ongoing pollution from this sort of breakdown, the causes were invariably patched rather than permanently repaired.

114. The same corporate philosophy required cutting corners when major additions or repairs to the physical plant were undertaken. The pipelines buried under Cecil Miller's land are a typical example. Rueschhoff refused to allow those transite pipelines to be bedded in sand, as required by the manufacturer, because of the additional expense sand bedding would have incurred. This knowing and intentional refusal by Rueschhoff was the direct and proximate cause of the later breaks in those pipelines during seasonal changes. The pollution that escaped from those breaks was a perfectly foreseeable consequence of the improper and inferior manner in which the pipelines were installed.

Even after the breaks started occurring and American Salt's management was on actual notice that the improper installation of the pipelines was directly causing pollution of the environment, Rueschhoff still refused to authorize sand bedding, even when sections of the pipelines were already dug up to be repaired.

115. The same cost-cutting measures exacerbated the pollution that did occur. For example, the solution mining network incorporated an insufficient number of valves and controls, making it impossible, in many instances, to isolate a leaking component without completely shutting down the plant and halting production. Part of this difficulty was due to the massive interconnections in the active brinefields, but those interconnections were themselves the result of corner-cutting and profit-maximizing. When production was significantly raised to increase profitability, the major capital expense of drilling sufficient new wells to support that production rate was avoided by operating the existing wells in the reverse mode. While this tripled brine output with no major capital investment, it also caused the brinewells to interconnect in a shockingly short time, after only three percent of the available salt thickness had been mined. The decision to maximize profits by operating the wells in the reverse mode was a knowing and conscious one. The rapid interconnection of the wells—and the resulting loss of control over the brinefield and the inability to isolate leaks and other problems—was a perfectly foreseeable consequence. Once these problems combined, management had a strong incentive to tolerate pollution: shutting down the entire plant, and forfeiting production and profits, was such a drastic step that it was only undertaken in the most absolutely compelling of circumstances.

116. These difficulties are well illustrated by the incident concerning well 34. When the well was discovered to be communicating with both the active solution mining operation and the fresh water aquifer, American Salt's management was promptly notified of that fact. Because well 34 had interconnected with the active brinefield, the well could not be isolated for repair without shutting down the entire solution mining process. Shutting down the entire solution mining process meant forfeiting production and profits. Upper management therefore decided to ignore the problem and to continue operating the interconnected solution mining process without repairing well 34 until the next scheduled shutdown, still some six months in the future. American Salt's management made an intentional and reasoned decision to permit 250 gallons per minute of saturated brine to escape into the fresh water aquifer for six months, rather than to shut down the plant and repair the problem. This result was avoided only because a lower-level superintendent shut down the plant without authority and repaired the leaking well.

117. The philosophy of American Salt's management is further illuminated by the history of the emergency catch basin. The massive pollution that occurred when the vacuum pans were dumped during upsets was itself the result of a long-standing management decision to intentionally pollute the environment rather than permit the pans to plug up and thereby lose two days' production and the $60,000 required to unplug the pans. Once the decision to dump the pans rather than plug them up had been made, the pollution consequences could still have been completely avoided by constructing a low-technology emergency catch basin. Such construction cost money, however, and did nothing to increase production or profits. Rueschhoff therefore strenuously opposed the installation of the emergency catch basin, and finally capitulated only when the Kansas Department of Health and Environment [KDHE] promised to shut the plant down if the emergency catch basin were not built. Rueschhoff was proud of the fact that he did not do anything to prevent pollution until he was forced to do so by the State.

118. Rueschhoff's attitude towards the adjacent landowners who were bearing the brunt of the salt pollution was shocking.

He viewed the farmers' continual complaints about American Salt's pollution as a potential threat to production and as a nuisance. When public outrage reached a critical level in early 1977, the KDHE held a public hearing concerning the National Pollution Discharge Elimination System permit soon to be issued to American Salt. American Salt plant manager Bill Shirley appeared at the hearing and read a prepared statement that was extremely conciliatory and made sweeping statements that pollution from the plant had been abated and would not occur in the future. The citizens at the meeting were angry and hostile, and Shirley attempted to answer their questions and to make statements that would defuse their hostility. When Rueschhoff learned of these statements, he was dissatisfied with them because he felt the farmers should have been told off, rather than accommodated. When Shirley replied that the landowners would get a court order shutting down the plant if pollution continued, Rueschhoff declared that he would get an injunction and be open again the next day, and that he would "run the creeks white with brine" if necessary to maintain production and fulfill the company's obligations to its paying customers.

119. Despite Rueschhoff's dissatisfaction, Shirley posted new operating instructions at the plant on March 17, 1977 that were designed to put the promises made at the public meeting into practice. The tenor of the instructions was to permit the vacuum pans to plug up, if necessary, to avoid polluting the environment. Rueschhoff was notified of these new instructions within a week of their posting, and made no comment.

120. The new instructions were put to use for the first time in April of 1977. The city water main to the plant broke, and cooling water to the circulation pumps on the vacuum pans was lost. To prevent burning out the pumps, the operators shut the pans down. In accordance with Shirley's instructions, however, the pans were not dumped, and were allowed to plug up. Production was lost for forty-eight hours and $60,000 was spent to unplug the pans.

Rueschhoff's reaction was one of outrage. He informed Shirley that he would never tolerate having the pans plugged again, and directed Shirley to operate the pans without regard to the pollution laws if that was necessary to keep from plugging the pans. In Rueschhoff's opinion, dumping the pans and taking the maximum fine that the KDHE could impose for any one event —$10,000—was a much better deal than plugging the pans, spending $60,000 to unplug them, and losing two days' production. Rueschhoff made a conscious and reasoned decision to pollute the environment and take the occasional $10,000 fine as a cost of doing business.

121. When he was personally confronted by angry landowners, Rueschhoff preferred to employ a strategy of intimidation. His ability to do so was substantially enhanced by the central position of American Salt in the Lyons economy and by the vast resources commanded by the corporate shareholders of American Salt. Thus, for example, when Cecil Miller finally threatened legal action against American Salt, Rueschhoff dared Miller to file suit and boasted that the money and lawyers available to American Salt would enable it to drag any litigation out for years, bankrupt Miller in the process, and take his land from him. It appears that at least the first part of this boast was not an idle one.

122. After a somber reflection on the evidence and testimony in this case, and a careful assessment of the credibility of the various witnesses, this Court finds that Rueschhoff operated the salt plant with a full and informed realization of the imminence of the danger it posed to the environment and the rights of the plaintiffs, and that he operated the plant on a day-to-day basis with an attitude that ranged from a complete indifference to the foreseeable consequences at its best, to a reckless disregard of the plaintiffs' rights at its worst. With regard to many aspects of the plant operations, for example, dumping the vacuum pans during upsets, the Court finds that Rueschhoff intentionally performed acts that damaged the plaintiffs and the envi-

ronment, that he acted with full knowledge of the damage that would ensue, and that he acted without sufficient cause or excuse.

123. Cudahy and General Host not only had actual knowledge that Rueschhoff was operating their plant in this manner, but were in fact responsible for their plant being operated in this manner. Rueschhoff was deeply committed both to salt mining as a business and to the continued existence of American Salt as a going concern. Cudahy and General Host were committed to neither. In order to survive, American Salt had to promise—and deliver—constantly increasing profits to the corporate holders of its stock, because that is what those holders were committed to. In order to deliver constantly increasing profits, American Salt had to economize to a dangerous degree in areas so crucial to pollution control as maintenance, repair, and capital improvements, and had to operate the plant in an irresponsible manner to continually increase production.

124. Cudahy and General Host were hardly passive investors in and ordinary stockholders of American Salt. Quite to the contrary, both companies were very deeply involved in the budgetary and financial aspects of American Salt's operations. Although American Salt maintained its own board of directors and complied on the surface with the requisite corporate formalities, it was incapable of concerted effort absent approval by Cudahy or General Host. Budgets were developed by American Salt's management and subjected to approval by Cudahy or General Host. After General Host's 1972 acquisition of Cudahy and American Salt, all of American Salt's budgets were submitted directly to General Host. Capital improvements had to be justified on a profit basis and approved by General Host before they could be implemented. Profits and losses were not reported on a tax return by American Salt, but were instead reported directly to General Host, which claimed American Salt's profits and losses on General Host's tax return. Although substantial funds were spent to modernize the American Salt facility and greatly increase its productive capacity, no money was spent on items related solely to pollution control unless the State was applying pressure for a particular project.

125. In addition to placing intense profit pressure on American Salt's local management and exercising substantial independent control over American Salt's budgetary and financial operations, General Host also kept itself apprised of the major day-to-day operations of American Salt and the state of the pollution problems. Field trips to Lyons were routinely made by General Host executives. General Host's supervisory activity was so detailed that even the public statement read by Shirley at the KDHE's public hearing in early 1977 received prior review and approval by General Host executives. General Host received actual notice of the numerous monetary fines imposed on American Salt by the KDHE, one of which was for the maximum amount allowed by law, and of the factual basis supporting those fines. In short, General Host was fully informed about the pollution that was occurring at the American Salt plant, General Host did nothing to halt that pollution, and General Host actively participated in the formulation of the public face displayed by American Salt to the plaintiffs in this case, the citizens of the state, the State itself, and this Court.

126. General Host also received direct and actual notice of the manner in which the plant was being operated from Rueschhoff's subordinates. A provision in General Host's procedures manual provided a mechanism for junior executives to bypass their superiors and to report directly to General Host if any senior executive ordered a subordinate to take actions contrary to state or federal law. When Rueschhoff directed Shirley to operate the vacuum pans without regard to the pollution laws of the state of Kansas, Shirley responded by sending a letter of resignation to Rueschhoff. Shirley also mailed a copy of the resignation letter and a cover letter directly to the head of General Host's corporate legal department.

127. By mailing a copy of his very serious charge directly to General Host, Shirley put General Host on actual notice that its salt plant was being operated under instructions from the highest level of local management to intentionally pollute the environment and to intentionally violate the rights of adjacent landowners if such pollution was economically advantageous for American Salt. General Host nevertheless limited its investigation to having a delegate telephone Rueschhoff directly. Of course, Rueschhoff denied making the statements Shirley attributed to him. Amazingly, General Host terminated its investigation at that point. No one from General Host even contacted Shirley for his version of the events, let alone members of lower management or employees. When Shirley again took the initiative and called General Host directly five days later, he was told that his letter had been received and that General Host was satisfied with the manner in which Rueschhoff was handling the pollution problems at the plant. Later that day, Rueschhoff accepted Shirley's resignation.

128. By virtue of its actual notice of the pollution occurring at American Salt's plant, its refusal to take steps to correct that pollution, and its active participation in the management affairs of American Salt, General Host effectively ratified Rueschhoff's past acts and authorized him to continue to operate the plant in the same manner in the future, despite the fact that his complete indifference to and reckless disregard of the environment and the rights of the adjacent landowners made him unfit to direct the policy and activities of the corporation.

129. The Court finds that any award of punitive damages, to adequately punish the corporate wrongdoers and to serve as a credible example to restrain and deter others from engaging in similar conduct, must be determined with due regard to the net worth of the defendants. Evidence of General Host's financial condition was introduced at the trial. In view of the considerable financial resources controlled by General Host and its net assets of over $450,-000,000, the Court finds that an appropriate punitive damage award would amount to $10,000,000.

## E. Alternative Remedies

130. The plaintiffs in this lawsuit have an attachment to their land that runs considerably deeper than the mere financial value of the property. Considerable evidence was introduced to show that this property is unusually well-suited for farming because of its high-quality soil, level terrain, and easy access to a constantly recharging source of fresh underground water. Considerable pride is involved in owning property of this quality. In addition, the sons and daughters of some of the plaintiffs are the fourth generation of their families on their parcels. The value of this family history is, of course, extremely difficult to estimate.

131. The plaintiffs also made it abundantly clear that, if they had the power to select any remedy they wanted, they would choose to have the water under their properties restored and once again fit for irrigation and domestic uses. The plaintiffs do not view this litigation as a get-rich-quick opportunity. Instead, they desire only to farm their own land, unfettered by the salt plant's activities.

132. An award of the damages suffered by the plaintiffs because of their inability to irrigate is appropriate in this case because it directly addresses the rights that American Salt violated by introducing the pollution into the groundwater. An award of punitive damages, on the other hand, would serve to punish and deter American Salt, but would do nothing directly to address the violated rights. The plaintiffs would likewise be hard-pressed to directly address those rights were each plaintiff granted a fraction of a punitive damage award. The pollution presently existing in the aquifer is a problem that can only be effectively addressed in terms of the area as a whole, rather than as individual tracts.

133. The Court also finds that important societal interests mingle in this contro-

versy. While the plaintiffs have suffered a direct injury, the state has also been injured by the damage done to a valuable natural resource. The problem is also not limited just to the plaintiffs in this lawsuit and the land they own or lease. Because the aquifer flows, the salt dissolved in it will continue to move downstream unless steps are taken to extract that salt. Thus, increasing numbers of the state's citizens will be injured as the pollution continues to spread. The aquifer joins the Arkansas River at Hutchinson, and that river then flows through Wichita, the largest city in Kansas, before entering the state of Oklahoma. The pollution will make this journey if affirmative steps are not taken to abate it.

134. There is a very high probability that remedial measures could prove effective in removing a substantial amount of the pollution from the aquifer at a reasonable cost well within the range of the defendants. Dr. Dan Raviv, an eminent geohydrologist, was an expert witness for the plaintiffs. His curriculum vitae and extensive courtroom testimony on most of the essential issues in this case were very impressive and were found to be very highly credible by the Court in reaching these findings of fact. Dr. Raviv identified nine possible strategies for removing the pollution, ranging from doing nothing to installing desalinization facilities, and roughly predicted their costs and results. *See* plaintiffs' exhibit 275. The practicality of remedial measures is demonstrated by the large quantity of salt inadvertently removed from the aquifer by the salt plant with the water it intentionally pumps for its various plant processes. While the defendants point to this removal as support for their anserous argument that they deserve "credit" against the pollution they intentionally introduce into the aquifer for the pollution they quite incidentally remove from the aquifer with their process water, the Court views this removal as an actual demonstration of the feasibility of remedial measures. The Court is very impressed with this entire subject matter and finds that the various clean-up strategies have a

substantial potential to benefit all of the parties to this case, as well as the state. If the pollution were removed from the aquifer, the plaintiffs would benefit by having clean water at their disposal; the defendants would benefit by halting future liability, both to the present plaintiffs and to the large class of potential plaintiffs who have not yet been injured by the advancing pollution; and the state would benefit by the restoration of its natural resource and the vindication of the rights of its citizens.

135. Throughout the trial, American Salt insisted that it was and is a responsible corporate citizen. In the Court's view, this assertion could be vindicated by American Salt's taking the responsibility upon itself to make a careful investigation of the various clean-up alternatives and by American Salt's making a substantial good-faith effort to implement and carry through to conclusion the best of those alternatives. The first step must be the installation of a well-designed system of monitor wells, so that the nature and extent of the problem can be precisely outlined. American Salt has voluntarily agreed to participate in the installation of such a system. The Court approves of this procedure and finds that American Salt should be given a meaningful opportunity to assess the alternatives, determine the nature and extent of the existing pollution, and select the most appropriate strategy for repairing the damage.

136. The Court further finds that holding a final judgment as to punitive damages in abeyance, contingent on the feasibility of restoring the aquifer to an unpolluted condition and American Salt's good-faith efforts to accomplish and finance such a restoration, would act as a strong incentive for properly performing those good-faith efforts.

### F. Statute of Limitations

137. As previously mentioned, American Salt filed a very substantial motion for partial summary judgment based on the expiration of the applicable statute of limitations, which this Court squarely rejected

some nine months before trial. Despite this unequivocal ruling, the defendants continued to press the statute of limitations defense and spent considerable time during the trial introducing evidence whose only possible relevance was to the application and operation of the statute of limitations. Because of these continuing attempts by the defendants to revitalize and rehabilitate this defense, and because some of the testimony introduced during the trial concerning the defense was relevant, the Court will briefly re-examine this area.

138. Application of the traditional notions embodied in statutes of limitations to the facts of this case is troublesome and difficult. The difficulty can be traced, in large part, to the unique interrelationship between the acts committed by the defendants, the glacial movement of the water in the aquifer, and the physical location of the plaintiffs. An act of pollution can be committed by the defendants on their own property in a matter of hours or days. Once that pollution is introduced into the aquifer, it is carried downstream regardless of whether the defendants continue to commit acts of pollution or halt those acts. The movement of the water in the aquifer amounts to inches per day, taking approximately ten years to travel one mile if not influenced by pumping. Some of the plaintiffs' properties in this case are more than five miles from the salt plant, and more than three miles from the closest corner of the new brinefield.

139. The statute of limitations could arguably start to run when an act of pollution is committed, or when the pollution in the aquifer leaves American Salt's property, or when the pollution front or a particular surge of pollution physically passes a particular plaintiff's property line, or when pollution prevents a plaintiff from doing something he would otherwise have done, such as irrigate a growing crop. Because the statute specifically provides that no cause of action accrues "until the act giving rise to the cause of action first causes substantial injury," K.S.A. § 60–513, a similar difficulty arises in attempting to determine what has been injured and when that injury first became substantial. A truly deplorable amount of energy and highly trained legal talent has been wasted in this case bickering over the almost endless permutations of these numerous variables. The problem has been exacerbated by the inconsistent and unprincipled Kansas case law on the subject, as this Court has previously lamented at great length.

140. In this Court's view, applying any rigid and mechanical limitations period to the facts of this case has the potential to work substantial injustice. If the statute begins to run when an act of pollution is committed, the two-year limitations period would expire, in many instances, before the resulting polluted groundwater ever left American Salt's property: in two years, the aquifer travels only about a thousand feet. If the statute begins to run when the polluted groundwater leaves American Salt's property, no one but the landowners within a thousand feet of American Salt's property lines could ever have a cause of action, despite the obvious injuries suffered by more remote landowners. If the statute begins to run when the pollution front first passes a particular plaintiff's property line, a determination of all future damages from that moment on would have to be made, despite the fact that the natural flow of the groundwater will carry that particular pollution away. If the statute begins to run when a particular surge of pollution passes a particular plaintiff's property line, the future damages problem is joined by nearly insoluble problems of definition, causation, and damage allocation. Regardless of when the statute begins to run, the facts remain that the defendants are responsible for the pollution and the plaintiffs, without fault of their own, are damaged by the pollution.

141. In order to better argue their defense, the defendants have persisted in defining the damage they have done as damage to the aquifer *per se*. The Court views this definition as the root of the problems encountered in attempting to apply the statute of limitations to the facts of this case. Once the damage is so defined, it is

fairly expedient to argue that the damage is "permanent," as that term is used as a term of art in Kansas statute of limitations jurisprudence, and that such "permanent" damage is barred by the statute of limitations. The Court regards this view as a gross oversimplification of the problem. The salt dissolved in the groundwater is not harmful in and of itself. The salt pollution does not make the surface uninhabitable. Likewise, the plaintiffs are not water merchants whose plans to reduce the groundwater to their possession for sale as a valuable commodity have been frustrated directly by the pollution. The effect is not the same as if the plaintiffs had contaminated American Salt's salt deposits with radioactive wastes and rendered those salt deposits worthless. The plaintiffs are farmers. Their only interest in the groundwater is in its ability to provide moisture to their growing crops. The Court finds that the injury suffered by the plaintiffs is the injury to those growing crops caused by the inability to irrigate them, which is, in turn, caused by the presence of the salt in the groundwater. The plaintiffs suffer no injury from the abstract and ethereal damage to the substrata of their property. If the entire area at issue in this lawsuit were covered by a gargantuan suburban shopping mall with commodious parking lots, there would be no injury from the pollution, just as there is no injury to anyone now when the highly polluted effluent injected by the defendants into the Arbuckle moves under the property of various individuals at a depth of 4000 feet.

142. Regarding the injury suffered by the plaintiffs as the injury done to their growing crops conforms the available remedies between these parties to the reality of their relationship. No one seriously disputes that all of the present plaintiffs' groundwater will naturally clear sufficiently for irrigation use within twenty to thirty years of the last acts of pollution. It is also very probable that this period could be cut in half, or perhaps by as much as three-quarters, if remedial action were undertaken. Permitting the plaintiffs to regularly recover their ascertainable crop damages will serve both to compensate them for the actual harm they have suffered as a direct consequence of the defendants' activities, and to vindicate society's right to an unpolluted environment by refusing American Salt a license to pollute and encouraging American Salt to undertake the repair of the damage it has already done.

143. Providing the defendants with an absolute immunity based on the statute of limitations would be particularly shocking in light of the continuing pollution that this Court has found to be emanating from the plant. The lack of direct causal link between the pollution escaping today from the plant and the injury suffered today by a farmer because of pollution that escaped one or two or ten years earlier is completely immaterial. What is material is the direct causal link between the polluting acts of the defendants and the injuries suffered by the plaintiffs. Regardless of when the polluting acts occurred, and regardless of society's changing views on the propriety of polluting the environment over the years, the defendants have never had a right to pollute the groundwater and they have never had a right to intentionally injure the surrounding landowners with impunity. The physical fact that the aquifer moves slowly is not a valid defense for the pollution that has occurred and continues to occur.

144. The plaintiffs will continue to suffer compensable damages so long as the annual crops they grow—or the annual crops that they could grow, but for the pollution—continue to be damaged by the polluted condition of the groundwater. As each annual crop is damaged, a cause of action for that damage will accrue, and each plaintiff must file a claim on that cause of action within two years.

145. The Court further finds that the defendants have engaged in active and assertive conduct that is relevant to the application of the statute of limitations. In particular, the Court finds that the defendants consciously adopted a policy of making statements that were known to be false when made, such statements being intend-

ed to mislead potential plaintiffs and to induce them to slumber on their rights.

146. The most egregious of these false statements was the oft-repeated assertion by American Salt's management that all pollution at the plant had ceased and that the pollution in the groundwater would clear and dissipate within "several years." These statements first surfaced in 1958, after American Salt had completed its first efforts at controlling its pollution of the environment. They were, in the normal course of affairs, made by American Salt to Norman Biegler, a state official of the KDHE. Biegler foreseeably gave the statements wide distribution, *see, e.g.*, defendants' exhibit B–60a.

147. Potential plaintiffs who heard that the salt plant was no longer polluting and that the pollution in the aquifer would clear within "several years" were misled by those statements and detrimentally relied on them by abstaining from promptly filing suit.

148. A further example of this policy of making intentional misstatements and concealing material information can be found by examining the various drafts of the engineering report prepared by Wilson & Company. In May of 1977, the KDHE, citing "the repeated failure of the American Salt Company and its staff to solve its pollution problems," ordered the plant to hire a qualified engineering firm to examine the brinewells and brine transport system, groundwater pollution and stormwater run-off, and the internal plant processes. *See* plaintiffs' exhibit 114. After examining these areas, the firm was to prepare a formal engineering report summarizing its findings and recommending remedial measures for the pollution sources it had identified. Wilson & Company of Salina, Kansas was hired for the job. American Salt employees were instructed to be polite to the Wilson & Company investigators and to answer their direct questions, but to never volunteer information.

149. A preliminary draft of the Wilson & Company report was completed in December of 1977, some nine months after this lawsuit was filed. *See* plaintiffs' exhibit 421. Instead of being submitted to the state, however, this preliminary draft was submitted to the management of American Salt. There, it underwent numerous revisions as suggested by management and legal counsel. The final report was completed in July of 1978, *see* defendants' exhibit R–5.

150. A careful comparison of the preliminary and final drafts reveals that substantial relevant information was stricken from the report by American Salt's management. Two subject areas were edited with a particularly heavy hand: the general introductory section of the original report, pages 1–1 through 1–12; and the groundwater control program section of the original report, pages 5–1 through 5–2 and figures 5–1 through 5–12.

151. The general introductory section, as originally written, contained many references to the problem posed by surface deposits of salt that could be dissolved by rain and percolated into the groundwater. Surface deposits were identified at the north dump site, exhibit 421 at 1–9, and covering some thirty-seven acres of the plant's surface that had "been saturated with salt over the many years of operation," exhibit 421 at 2–1, 1–8. Frequent mention was made of the possibility of leaching and percolation from the surface salt scars around the brine wellheads, exhibit 421 at 1–4, 1–9, 1–10. Wilson & Company recommended that the drainage ditches, the area around the disposal well, and the areas around the brinewells all be excavated and the contaminated soil safely encapsulated, exhibit 421 at 4–1, 4–2. Implicit in these comments was the realization that salt on the surface posed a genuine threat to the integrity of the aquifer. This Court has found that salt on the surface in fact resulted in substantial contamination of the aquifer. American Salt's management nevertheless deleted every reference to the surface salt scars, and went so far as to delete every reference to the possibility of surface salt leaching into the groundwater, with the exception of one vaguely

worded reference concerning the north dump site, exhibit R–5 at 4–3. By eliminating these references from the final report, despite American Salt's actual knowledge that these sources were contributing to the contamination of the groundwater, American Salt essentially misrepresented that no threat was posed by these sources.

152. The groundwater control program section, as originally written, contained a brief general introduction, a description of the aquifer, an analysis of the groundwater quality data as derived from the state monitor wells, an identification of the sources of groundwater contamination, suggested control measures, and a complete set of charts showing the chloride readings in the state monitor wells from 1968 to 1978, exhibit 421 at 5–1 through 5–2 and figures 5–3 through 5–11. This section was completely gutted in the final report: all that survived was part of the introduction, part of the aquifer description, and three of the accompanying figures. All references to the state monitor wells and the extent of the pollution in the aquifer were completely eliminated—even the location of the state monitor wells, shown on figure 5–12 of the original report, were blotted out in the corresponding figure 4–3 of the final report.

153. Wilson & Company identified two sources that they suspected of contributing to the groundwater contamination:

  a. The surface run-off carries a high concentration of chloride which infiltrates into the groundwater.

  b. Subsurface sources of potential pollution are the brine, waste, and recycle transport lines that may rupture and leak.

Exhibit 421, at 5–2. These suspicions have been borne out by the evidence in this case, which shows that substantial groundwater contamination occurred from both of these sources. American Salt's management nevertheless deleted the identification of these two sources from the final report, despite American Salt's actual knowledge that these sources were contributing to the contamination of the groundwater. By eliminating the sources from the final re-port, American Salt essentially misrepresented that no threat was posed by these sources.

154. If American Salt was without actual knowledge that these surface and subsurface sources were contributing to the contamination of the groundwater, its intentional act of deleting those sources from the final report, and thereby deleting those sources from further consideration for remedial measures, without conducting any investigation to determine the true facts, evinces the sort of reckless disregard for the rights of others, in the face of a known danger, that is highly relevant to the issue of punitive damages.

### G. Miscellaneous Findings of Fact

155. In the course of the trial many assertions were made by the parties and many alternative theories were advanced. Individual comment on these matters would be time-consuming and feckless. Suffice it to say that the Court has given due consideration to the entirety of the record and proceedings before it, and that any assertion or theory not discussed in this Opinion has been considered and rejected, rather than overlooked.

156. The trial of this case was marred by many scurrilous accusations of professional and ethical misconduct by the attorneys involved in the long saga of this dispute. The Court expressly finds that these accusations were made in the heat of the moment, that they resulted from counsels' deep personal involvement in the case and the pressures of trial, and that they are completely without foundation in either fact or reality. From the Court's viewpoint, counsel for the parties were most competent in performing their duties, courteous and attentive to the Court, and scholarly in their written briefs. Counsel presented their respective theories of the case with expedition and excellence.

157. Any of the preceding findings of fact that are held to be operative only as conclusions of law shall be considered conclusions of law.

## II. CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties to and subject matter of this dispute by virtue of the complete diversity of citizenship between the plaintiffs and the defendants and the requisite amount in controversy, 28 U.S.C. § 1332(a).

2. Venue is proper in this Court because all of the plaintiffs reside in this judicial district and the claims arose here, 28 U.S.C. § 1391(a).

3. The plaintiffs, as owners or tenants of the lands involved in this case, are entitled to the possession of those lands, and therefore have standing to bring this suit for injury to their possessory interests, *Klassen v. Central Kansas Co-operative Creamery Association,* 160 Kan. 697, 165 P.2d 601 (1946). The controversy between these parties is ripe and justiciable.

4. Under the laws of the state of Kansas, nuisance "is a field of tort liability rather than a type of tortious conduct," *Culwell v. Abbott Construction Co.,* 211 Kan. 359, 364, 506 P.2d 1191 (1973). The appropriateness of the "nuisance" label, on a particular set of facts, thus turns on the interests invaded and the harm inflicted, rather than on the nature or quality of the defendant's acts, *id.*

5. The Kansas Supreme Court has declared that a "nuisance is an annoyance, and any use of property by one which gives offense to or endangers life or health, violates the laws of decency, unreasonably pollutes the air with foul noxious odors or smoke, or obstructs the reasonable and comfortable use and enjoyment of the property of another, may be said to be a nuisance." *Allen v. City of Ogden,* 210 Kan. 136, 139–40, 499 P.2d 527 (1972).

6. A private nuisance "is a civil wrong, based on a disturbance of some right or interest in land," *Culwell,* 211 Kan. at 362, 506 P.2d 1191. A public nuisance, in contrast, "must affect an interest common to the general public rather than peculiar to one individual. Stated another way, a public nuisance is one which annoys a substantial portion of the community," *id.* at 363, 506 P.2d 1191.

7. A nuisance *per se* "is an act, instrument, or structure in which is a nuisance at all times and under any circumstances," *Vickridge Homeowners Association, Inc. v. Catholic Diocese of Wichita,* 212 Kan. 348, 355, 510 P.2d 1296 (1973). A nuisance *per accidens* or nuisance in fact "is an act, instrument, or a structure which becomes a nuisance by reason of surrounding circumstances," *id.*

8. The salt plant located southeast of Lyons, Kansas and owned and operated by the defendants is a nuisance. The escape of great quantities of salt from the plant and the invasion of the fresh groundwater by that salt annoys the surrounding landowners, endangers their health and their businesses, violates the laws of decency, and unreasonably obstructs their lawful and reasonable use and enjoyment of their lands for agricultural purposes. The interference with the plaintiffs' use and enjoyment of their lands is substantial.

9. The salt plant is primarily a private nuisance, inasmuch as the rights of the plaintiffs to use and enjoy the property at issue in this lawsuit are the rights that have primarily been disturbed by the pollution released by the defendants. Elements of a public nuisance also mingle in this controversy, because the pollution released by the defendants has wrought substantial damage to a precious natural resource and thereby infringed the public interest in maintaining the state's water resources in a pure and unpolluted condition.

10. The salt plant is not a nuisance *per se:* if operated in a careful and prudent manner, the plant would not be a nuisance at all. The plant is a nuisance *per accidens:* it is a nuisance because of the surrounding circumstances under which it has been and is being operated. The nuisance *per accidens* label is also appropriate because the pollution escaping from the plant could be prevented, and the nuisance thereby abated.

11. Because the defendants own and operate a private abatable nuisance *per accidens*, they are liable for the actual damages flowing from that nuisance, *Newman v. Nelson*, 350 F.2d 602, 604–05 (10th Cir.1965) (construing Kansas law).

12. Alternatively, the Court concludes that the escape of the salt into the groundwater would not have occurred in the absence of negligence or some more culpable conduct, that the plant was at all times within the exclusive control and possessin of the defendants, and that the plant was operated in a manner that, at a minimum, rose to the level of negligence. It is a general principle that defendants are liable for the actual damages flowing from their negligence, *see e.g., Noel v. Menninger Foundation*, 175 Kan. 751, 762, 267 P.2d 934 (1954).

13. Because pollution continues to emanate from the salt plant in legally significant quantities, it is a continuing nuisance. Because the salt plant is a continuing abatable nuisance, it gives rise, over and over again, to causes of action to recover for the injuries sustained by the surrounding landowners in the statutory period immediately preceding the filing of the suit, *Miller*, 567 F.Supp. at 906, and cases cited therein.

14. The injury suffered by the plaintiffs in this case has primarily manifested itself in the damage done to the plaintiffs' growing crops, or in the plaintiffs' inability to grow certain crops at all. Such injuries constitute compensable damages, measured by the value of destroyed crops and the difference, caused by the injury, in the value of injured crops. *Sayers v. Railway Co.*, 82 Kan. 123, 126, 107 P. 641 (1910). Annual crops can only be injured or destroyed in the year in which they grow, so each injury or destruction gives rise to a separate cause of action, and sequential injury to or destruction of several sequential annual crops gives rise to several sequential causes of action.

15. The plaintiffs have fully mitigated their damages by growing dryland crops on the affected land. *Iseman v. Kansas Gas and Electric Company*, 222 Kan. 644, 567 P.2d 856 (1977); *Theis v. duPont, Glore Forgan, Inc.*, 212 Kan. 301, 510 P.2d 1212 (1973); *Steele v. J.I. Case Company*, 197 Kan. 554, 419 P.2d 902 (1966).

16. The Court concludes that the defendants are liable to the plaintiffs in the amount of $3,060,000 for the temporary damages to the plaintiffs' annual crops wrought by the defendants' continuing abatable nuisance in the period from May 31, 1975, the date to which the two-year statute of limitations found at K.S.A. § 60–513 extends from the date the original complaint in this case was filed, to December 31, 1983. The plaintiffs will equitably apportion this award among themselves as their interests may appear.

17. Certain plaintiffs have suffered consequential damages because of the operation of the defendants' continuing abatable nuisance. The defendants are liable for these damages because they are the natural and probable result of the maintenance of the nuisance, *see, e.g., Ettus v. Orkin Exterminating Co.*, 233 Kan. 555, 562, 665 P.2d 730 (1983); *Foster v. Humburg*, 180 Kan. 64, 68, 299 P.2d 46 (1956).

18. The Court concludes that the defendants are liable for the following consequential damages: $5000 to Ed Tobias for damages to a domestic water well, $2000 to Lyle Brothers for damages to two domestic water wells, and $42,500 to Lyle Brothers for damages to his dairy operation. The damages to Brother's dairy included in this figure are those incurred between May 31, 1975 and December 31, 1983.

19. Certain plaintiffs have suffered damages because of brine flowing over their lands. The defendants are liable for these damages because the release of brine onto neighboring lands is a physical trespass. *See, e.g., Riddle Quarries, Inc. v. Thompson*, 177 Kan. 307, 311, 279 P.2d 266 (1955).

20. The Court concludes that the defendants are liable for the following damages resulting from brine trespasses: $3138.48 to Delbert Hollinger and $5100.03 to Cecil Miller. The figures include trespasses between May 31, 1975 and December 31, 1983. The Court further concludes that the cost of restoring this land is unreasonable, and that such restoration costs are, therefore, an improper measure of the damages actually suffered.

21. Cecil Miller suffers a trespass on his land by two of the defendants' pipelines. The defendants are liable for this continuing trespass, *Riddle, supra.*

22. Cecil Miller failed to introduce any credible evidence of actual damage from this trespass apart from his crop damages, for which he has already been compensated. Miller is, therefore, entitled to only nominal damages for this trespass, *Longenecker v. Zimmerman,* 175 Kan. 719, 721, 267 P.2d 543 (1954).

23. The Court concludes that the defendants are liable for their trespassing pipelines to Cecil Miller in the amount of $1.

24. The plaintiffs failed to carry their burden of proving their entitlement to the other consequential damages they sought, or their entitlement to damages for stress, aggravation, and mental anguish. The Court therefore concludes that the defendants are not liable to the plaintiffs for these damages.

25. The law of Kansas permits an award of punitive damages "when the elements of fraud, malice, gross negligence or oppression accompany the wrongful act. Such damages are awarded to punish the wrongdoer for his malicious, vindictive, willful or wanton invasion of the injured person's rights. They also serve as an example to restrain and deter others from the commission of such wrongs." *Kline v. Multi-Media Cablevision, Inc.,* 233 Kan. 988, 989, 666 P.2d 711 (1983).

26. "Wantonness" means a reckless disregard for the rights of others, *Cope v. Kansas Power and Light Co.,* 192 Kan. 755, 760–61, 391 P.2d 107 (1964), and may be "characterized by a realization of the imminence of damage to others and a restraint from doing what is necessary to prevent the damage because of indifference as to whether it occurs," *Boehm v. Fox,* 473 F.2d 445, 447 (10th Cir.1973) (applying Kansas law).

27. "Maliciousness" may be defined as "the intentional doing of a wrongful act with full knowledge of its character, and without cause or excuse," *Donley v. Amerada Petroleum Corp.,* 152 Kan. 518, 524, 106 P.2d 652 (1940).

28. The indifferent, persistent maintenance of a nuisance with a reckless disregard for the rights of others is an appropriate basis for the imposition of punitive damages, *Newman v. Nelson, supra.*

29. Corporations may be held liable for punitive damages arising from the conduct of their employees if "(a) the corporation or its managerial agent authorized the doing and manner of the act; (b) the employee was unfit and the corporation or its managerial agent was reckless in employing or retaining him; (c) the employee was employed in a managerial capacity and was acting in the scope of employment; or (d) the corporation or its managerial agent ratified or approved the act of the employee," *Kline v. Multi-Media Cablevision, Inc.,* 233 Kan. at 994, 666 P.2d 711 (1983).

30. Because Rueschhoff realized the imminence of the danger to the surrounding landowners of salt escaping into the fresh-water aquifer and did nothing to prevent that escape because of indifference to the surrounding landowners' rights, Rueschhoff wantonly invaded those rights. Intentional acts of pollution, such as dumping the vacuum pans during upsets, were done with a full knowledge of the damage that would be done and without cause or excuse, and were therefore done maliciously. Punitive damages are, therefore, appropriate on the facts of this case.

■ 31. Because General Host authorized Rueschhoff to do these acts; recklessly retained him despite his unfitness to manage the plant; ratified his acts of pollution; and employed him in a managerial capacity, in the scope of which the acts of pollution were committed; General Host is liable for the punitive damages arising from Rueschhoff's conduct. *Kline, supra.*

■ 32. The Court concludes that the facts and circumstances of this case are such that the Court should exercise its discretion to find the defendants liable to the plaintiffs for punitive damages, in the amount of $10,000,000.

■ 33. The plaintiffs have invoked the equitable jurisdiction of this Court by praying for injunctive relief. The Court concludes that this invocation of equitable jurisdiction is appropriate because of the continuing trespass by the defendants' pipelines on Cecil Miller's land, *see, e.g., Provident Mutual Life Insurance Company of Philadelphia v. State Highway Commission,* 155 Kan. 351, 354, 125 P.2d 346 (1942), and the persistent maintenance of a continuing private nuisance, *see, e.g., Buckmaster v. Bourbon County Fair Association,* 174 Kan. 515, 256 P.2d 878 (1953). A district court sitting in equity has broad powers to devise and fashion a remedy between the parties before it that works substantial justice between them, settles the matters in controversy, and prevents further litigation. *Stady v. Texas Company,* 150 Kan. 420, 425, 94 P.2d 322 (1939); *Puritan-Bennett Corp. v. Richter,* 8 Kan.App.2d 311, 315, 657 P.2d 589 (1983); *In re Miller,* 5 Kan.App.2d 246, 258–59, 616 P.2d 287, *affirmed in part and reversed in part on other grounds,* 228 Kan. 606, 620 P.2d 800 (1980).

■ 34. The continuing trespass by the defendants' pipelines on Cecil Miller's property must come to an end. The Court will, therefore, enjoin the continuation of this trespass, and will order the defendants to cease using the offending pipelines and to remove them from Miller's land. Because removal of the pipelines will cause damage to the surface of Miller's land, the Court will grant Miller the option of permitting the abandoned pipelines to remain buried under his property if he so wishes.

■ 35. In the further exercise of its equitable jurisdiction, this Court concludes that substantial justice would best be worked between these parties if the defendants could accomplish, at their own expense, the removal of a substantial majority of the salt from the aquifer. The removal of the salt from the aquifer would settle the most significant matter in controversy between these parties, restore them to their respective positions before the nuisance was created, and prevent further biannual litigation of the matters of concern in this lawsuit. This Court has the equitable power to order the defendants to undertake such a clean-up.

■ 36. At the present time, the Court is without sufficient knowledge or information to order the defendants to undertake any particular remedial program. Additional work by competent experts is needed to determine the existence, cost, efficacy, and feasibility of the various clean-up strategies that are or may be available to the defendants. The first step for any strategy *is* known to the Court, however: a well-designed system of monitor wells must be installed in the aquifer to determine the nature and extent of the pollution damage and to focus the requirements for the clean-up effort. The Court will, therefore, order the defendants to undertake the installation of such a system, in cooperation with an expert designated by the plaintiffs.

■ 37. Were the defendants to make a conscientious, good-faith, and realistic effort to address and remedy, within a reasonable time, the pollution presently existing in the aquifer, such an effort would be extremely relevant to this Court's assessment of the defendants' state of mind and to the appropriateness of the award of punitive damages that this Court has found to be fully justified on the facts of this case. In the exercise of its broad equitable pow-

ers, this Court concludes that the ends of substantial justice would best be served by holding the final judgment as to the punitive damage award temporarily in abeyance, pending the defendants' good-faith efforts to define and remedy the pollution they have caused. The Court will retain jurisdiction over this case and the punitive damage award to the fullest extent permitted by law while the clean-up alternatives are investigated and implemented, and may activate by a final judgment the punitive damage award, in whole or in part, at any time that it becomes apparent that the defendants are not pursuing the clean-up effort in good faith, or at any time that it becomes apparent that any clean-up effort is impossible for either scientific or financial reasons.

38. The Court concludes that, in the event the statute of limitations is deemed to apply to the claims of the plaintiffs in this case in such a way as to completely bar those claims, the facts and circumstances shown by the evidence clearly demonstrate that the statute of limitations should be equitably tolled and that the defendants should be equitably estopped from relying on the statute of limitations defense. *See, e.g., Newton v. Hornblower, Inc.,* 224 Kan. 506, 516, 582 P.2d 1136 (1978).

39. Because the Court must retain jurisdiction over the punitive damage award and the clean-up effort, no final judgment as to all claims, rights and liabilities of these parties can be entered at this time. However, the Court expressly determines that there is no just reason to delay the entry of a final judgment on the issues of liability and the amount of actual damages, and that the entry of such a final judgment would permit an appeal to proceed concurrently with the installation of the monitor well system and the preliminary engineering work on the clean-up alternatives. Such a concurrent appeal would be in the best interests of all concerned. The Court, therefore, will expressly direct the entry of a final judgment on the issues of liability and actual damages, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

40. Any of the preceding conclusions of law that are held to be operative only as findings of fact shall be considered findings of fact.

## COMMENT

In sum, after many years of delay and monumental discovery proceedings, this case culminated in a protracted and most adversarial trial. The evidence presented and the trial strategy employed by the defendants were unique: the defendants virtually admitted their pollutive acts over many decades and relied on a statute of limitations defense to excuse environmental conduct in their salt business that can only be termed deplorable, and that caused massive damage to the plaintiffs in this case. In the last analysis, the facts in this case certainly portray the validity of a well-known agricultural adage: "Before you can clear up the water you must first kick the hog out of the spring." The judgment of liability, the determination of actual damages and of conduct warranting punitive damages, the assessment of punitive damages, and the holding of those punitive damages in abeyance pending the Court's continuing effort to fashion an effective equitable remedy to restore the aquifer and prevent the spread of the pollution, are all sincere judicial attempts to vindicate that adage.

## FINAL JUDGMENT

1. IT IS THEREFORE ORDERED that the defendants are liable to the plaintiffs as a group for actual damages to growing crops in the amount of $3,060,000.00.

2. IT IS FURTHER ORDERED that the defendants are liable to the following particular plaintiffs for the following actual damages:

   (a) To Ed Tobias for damage to a domestic water well, $5,000.00.

   (b) To Lyle Brothers for damage to two domestic wells, $2,000.00.

(c) To Lyle Brothers for damage to his dairy operation, $42,500.00.

(d) To Delbert Hollinger for brine trespasses on the surface of his land, $3,138.48.

(e) To Cecil Miller for brine trespasses on the surface of his land, $5,100.03.

(f) To Cecil Miller for pipeline trespasses under his land, $1.00.

3. IT IS FURTHER ORDERED that the defendants are liable to the plaintiffs as a group for punitive damages in the amount of $10,000,000.00.

4. IT IS FURTHER ORDERED that the preceding award of punitive damages be held in abeyance pending evaluation and assessment of the potential clean-up alternatives, and that this Court retain jurisdiction over the punitive damages award until further order of this Court. In the event that the punitive damages award made herein is activated in whole or in part, depending on future events in the Court's invocation of its equitable powers to restore the aquifer, then such award as finally determined shall relate back to the date of this opinion and bear interest at the legal rate from and after August 13, 1984.

5. IT IS FURTHER ORDERED that the defendants forthwith undertake the installation of a monitor well system in consultation with an expert to be designated by the plaintiffs, and possibly an additional independent expert to be selected by the Court, and forthwith undertake the assessment and evaluation of the potential clean-up alternatives. This Court shall retain jurisdiction and supervision of these undertakings. The defendants, in cooperation with the expert designated by the plaintiffs and any selected by the Court, shall file progress reports with this Court at least every other month, to keep this Court fully informed of the progress being made in these undertakings. A final report on the available scientific clean-up alternatives shall be filed with the Court within eight months of the date on which this Opinion and Order is filed. Promptly after this report is filed this Court shall order the defendants to undertake the most appropriate of the clean-up alternatives. All of the parties to this suit will have a full opportunity to be heard on the issue of which clean-up alternative is most appropriate under the facts and circumstances of this case.

6. IT IS FURTHER ORDERED that the judgment of liability and the judgment for actual damages be certified as final appealable judgments pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.