**Ryan M. PATTON and Kathy Strunk, Plaintiffs,**

v.

**TIC UNITED CORPORATION, et al., Defendants.**

No. 91–2331–JWL.

United States District Court, D. Kansas.

July 25, 1994.

James A. Patton, Patton Law Office, Hiawatha, KS, Robin G. Maxon, Topeka, KS, Gary D. McCallister, Chicago, IL, for Kathy Patton Strunk.

James A. Patton, Patton Law Office, Hiawatha, KS, Jerry R. Palmer, Palmer & Lowry, Topeka, KS, Gary D. McCallister, Chicago, IL, for Ryan M. Patton.

**510**

Curtis L. Tideman, Lathrop & Norquist, Gregory L. Musil, William V. North, Shughart, Thomson & Kilroy, Overland Park, KS, Daniel M. Dibble, Lathrop & Norquist, Kansas City, MO, Thomas A. Sheehan, R. Lawrence Ward, Mark A. Olthoff, Dennis D. Palmer, Philip W. Bledsoe, Shughart, Thomson & Kilroy, Kansas City, MO, for Lear Siegler Inc., Lear Siegler Diversified Holdings Corp.

Curtis L. Tideman, Lathrop & Norquist, Overland Park, KS, Daniel M. Dibble, Lathrop & Norquist, Jennifer H. McCoy, Brian J. Madden, Lathrop & Norquist, Kansas City, MO, for Hutchinson Wil–Rich Mfg. Co.

Daniel M. Dibble, Lathrop & Norquist, Kansas City, MO, for TIC United Corp., a Delaware corporation.

Gregory L. Musil, William V. North, Shughart, Thomson & Kilroy, Overland Park, KS, Thomas A. Sheehan, R. Lawrence Ward, Mark A. Olthoff, Dennis D. Palmer, Shughart, Thomson & Kilroy, Kansas City, MO, for Rapistan Corp., LS Acquisition Corp., No. 27, LSDHC Corp., LS Acquisition Corp. No. 50, LS Acquisition Corp. No. 6.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

## I. Introduction

On May 17, 1994, a jury returned its verdict in this product liability action assessing 76 percent of the fault for plaintiff Ryan Patton's serious injuries to defendant TIC United Corporation ("TIC") because of its breach of the duty to provide a post-sale warning. The jury also awarded damages, which led this court, following the application of Kansas' comparative fault statute and K.S.A. 60–19a02(b), to enter judgment in favor of the plaintiffs against TIC in the amount of $998,735.61. The jury also provided on its verdict form that TIC acted in a wanton manner, thereby entitling plaintiffs to punitive damages under K.S.A. 60–3702.

On July 20, 1994, following the receipt of written submissions, the court conducted a separate proceeding regarding the punitive damage issue as provided for in K.S.A. 60–3702. At the hearing, the parties introduced evidence regarding the proper amount of punitive damages to be awarded. Additionally, the court issued it rulings on several post-trial motions.[1]

Having considered the evidence, the papers filed by the parties and their oral arguments, the court is now prepared to issue its ruling on the due process argument contained in TIC's Rule 50 motion (Doc. # 291) and concerning the amount to be awarded as punitive damages in the case. For the reasons set forth below, TIC's due process argument is denied and the court hereby enters judgment for plaintiffs against TIC for punitive damages in the amount of $1,000,000.00.

## II. Discussion

### A. TIC's Due Process Argument

TIC argues that the court's submission of the punitive damage question to the jury was violative of its due process rights and public policy, and thus erroneous, because prior Kansas law gave no notice to TIC that its conduct in not giving a post-sale warning could be the basis for an award of punitive damages. TIC bought the factory that made the defective cultivator in August of 1987. Ryan Patton's accident occurred in April of 1990. TIC argues that it was not until the Kansas Supreme Court's decision in *Patton v. Wil–Rich Mfg. Co.*, 253 Kan. 741, 861 P.2d 1299 (1993), which was filed on October 29, 1993, that there was a judicially created post-sale duty to warn in Kansas and, therefore, TIC had no notice prior to that date that it could be liable in any manner for punitive damages based on a theory of its breach of a post-sale duty to warn. TIC argues that due process requirements are not satisfied if punitive damages are imposed based on a rule of law created after

---

1. Plaintiffs' motion to alter or amend the judgment (Doc. # 297) was denied in its entirety. Defendant TIC's motion for judgment pursuant to Rule 50 of the Federal Rules of Civil Procedure or, in the alternative, for new trial (Doc. # 291) was denied in its entirety except for TIC's argument that the imposition of punitive damages in this case would violate its due process rights, which was taken under advisement by the court.

the occurrence of the conduct which gives rise to the punitive damages claim.

In support of its argument, TIC relies primarily on *TXO Production Corp. v. Alliance Resources Corp.,* —— U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). *TXO* involved a common-law action for slander of title in the state of West Virginia in which respondents obtained a judgment against petitioner for $19,000.00 in actual damages and $10 million in punitive damages. The Supreme Court granted certiorari to decide whether that punitive damages award violated the Due Process Clause of the Fourteenth Amendment, either because the amount was excessive or because it was the product of an unfair procedure. Throughout the majority of its opinion, the *TXO* court discusses petitioner's argument that a $10 million punitive damages award—an award 526 times greater than the actual damages awarded by the jury—was so excessive that it must be deemed an arbitrary deprivation of property without due process of law. The court rejected this argument. *Id.* at ——, 113 S.Ct. at 2722–23. Following this analysis, the court, in the last paragraph of its opinion, summarily disposed of respondent's argument that the procedure followed in the case to award punitive damages "was unconstitutionally vague" because it "had no notice of the possibility that the award of punitive damages might be divorced from an award of compensatory damages." *Id.* at ——, 113 S.Ct. at 2724. The court stated that:

> In *Wells v. Smith,* 171 W.Va. 97, 105, 297 S.E.2d 872, 880 (1982), the West Virginia Supreme Court of Appeals held that a defendant could be liable for punitive damages even if the jury did not award the plaintiff *any* compensatory damages. In any event, the notice component of the Due Process Clause is satisfied if prior law fairly indicated that a punitive damages award might be imposed in response to egregiously tortious conduct. Prior law, in West Virginia and elsewhere, unquestionably did so.

*Id.*

Defendant also cites three state court opinions in support of its argument that the imposition of punitive damages in this case would violate its due process rights or would, at least, be unfair and contrary to public policy. Those cases are *Vigil v. Arzola,* 102 N.M. 682, 699 P.2d 613 (N.M.App.1983); *Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 23 Ill. Dec. 559, 384 N.E.2d 353 (Ill.1979); and *Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975). Each of those cases involved a situation in which an employer had terminated an employee in reliance on long-standing terminable-at-will rules. Prior to the cases in question, the law in each of the three states had been that an employer could discharge an employee for any reason without incurring liability. In each of the three cases, the court reversed the prior terminable-at-will rules and found the employer liable for discharge of the employee based on public policy grounds. However, each of the courts denied any award of punitive damages on the grounds that it would be unfair to punish defendants for conduct which they could not have determined beforehand was even actionable. The Kansas Court of Appeals reached a similar conclusion in *Murphy v. City of Topeka,* 6 Kan.App.2d 488, 630 P.2d 186 (1981).

TIC contends that the holdings of these state court cases, when analyzed in light of the Supreme Court's statement in *TXO,* virtually leads to a constitutional rule that a newly created duty, such as defendant contends is present in this case, cannot give rise to a claim for punitive damages. Defendant contends that the proper test is whether prior law fairly apprises an actor that the actor's conduct may lead to a punitive damages award against it. Defendant argues that, in this case, there was no prior law that gave any hint that its failure to issue a postsale warning might warrant the imposition of punitive damages. Thus, defendant contends that imposition of punitive damages in this case would run afoul of the constitutional mandate of *TXO,* or at least would be so contrary to the public policy considerations enunciated in the state court cases that Kansas would decline to do so.

In response to defendant's argument, plaintiffs cite the Tenth Circuit case of *Southwest Forest Industries, Inc. v. Sutton,* 868 F.2d 352 (10th Cir.1989). In *Southwest*

*Industries,* the court held that punitive damages could be awarded for the retaliatory discharge of employees covered by collective bargaining agreements, even though the Kansas appellate court's opinion extending the cause of action to such persons was handed down during the pendency of the litigation. The court held that the presence of the prior Kansas Court of Appeals decision in *Murphy* recognizing the cause of action with respect to non-union employees had given the defendant ample notice of the potential for an award of punitive damages. *Id.* at 356. Thus, even though no Kansas court had spoken directly to the issue of whether employees covered by collective bargaining agreements could bring a retaliatory discharge action at the time of defendant's conduct, the Tenth Circuit held that punitive damages could properly be imposed.

Plaintiffs argue that, like the situation in *Southwest Industries,* in the present case there was a line of authority in Kansas that gave notice to defendant that post-sale duties did exist under Kansas law, and that such a duty could be extended to defendant under the facts of this case. *See Wooderson v. Ortho Pharmaceutical Corp.,* 235 Kan. 387, 681 P.2d 1038, *cert denied* 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984); *State ex rel. Stephan v. GAF Corp.,* 242 Kan. 152, 747 P.2d 1326 (1987); *Stratton v. Garvey Intern., Inc.,* 9 Kan.App.2d 254, 676 P.2d 1290 (1984). Plaintiffs further point out that defendant conducts business in many states, some of which had explicitly recognized a post-sale duty to warn under circumstances similar to those present in this case well before Ryan Patton was injured. *See, e.g., Hodder v. Goodyear Tire & Rubber Co.,* 426 N.W.2d 826 (Minn.1988), *cert. denied* 492 U.S. 926, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989). Thus, plaintiffs argue prior Kansas law and

the law of other jurisdictions gave TIC sufficient notice that its failure to issue a post-sale warning might warrant the imposition of both compensatory and punitive damages.

The court finds that the imposition of punitive damages in this case does not violate defendant's right to due process nor is it unfair. Although a closer case, perhaps, the court finds the situation here to be analogous to that in *Southwest Industries.* As was the case in *Southwest Industries,* the court believes that previous Kansas decisions were sufficient to give defendant fair notice of the potential for an award of punitive damages.[2] The court finds the retaliatory discharge decisions cited by defendant to be distinguishable from the present case. Those cases all involved situations in which the general as well as the specific conduct for which the defendants were found liable had been legal up until the judgments in those cases, and they represented a clear reversal of existing law. Such is not the case in this action. The extension of a post-sale duty to warn to manufacturers in the position of defendant in this case did not in any manner constitute a *reversal* of Kansas law. Rather, it was a logical extension of the general common law of Kansas, which had long required a manufacturer to exercise reasonable care, to a specific factual situation which had not previously been considered by the Kansas Supreme Court. That is sufficiently similar to the situation in *Southwest Industries,* which upheld punitive damages although there had been no prior Kansas case proscribing the specific conduct involved.[3]

The court believes that the trend in prior law in Kansas, as in other jurisdictions, should have fairly indicated to defendant that Kansas would recognize a post-sale duty to warn, the "egregious" breach of which might result in a punitive damages award.[4] Ac-

---

**2.** The court would be hesitant to rely on the fact that other relevant jurisdictions recognized the post sale duty before 1990 to evaluate defendant's conduct in Kansas. At the least, however, it does reflect on defendant's attitude and is pertinent to the analysis in the next section.

**3.** The defendant argues that because *Southwest Industries* was decided before *TXO* its precedential value is lacking in the face of a constitutional challenge. However, *TXO* is far from

clear in its pronouncement and this court is not convinced that *TXO* truly establishes, or even presages, a more stringent test than *Southwest Industries* used.

**4.** Here, the jury's finding of "wantonness" certainly satisfies *TXO's* "egregious" conduct standard. It means that the jury was convinced that the defendant realized the imminence of danger and showed complete indifference or reckless

cordingly, although the court concedes that this is an issue on which reasonable minds could well differ, the court holds that the principles of fundamental fairness and of notice, as required by the due process clause, are satisfied and the jury's finding of entitlement to punitive damages should be upheld.

### B. Punitive Damages

■ At the post-trial hearing held on July 20, 1993, in accordance with K.S.A. 60–3702, the court heard evidence from the parties regarding the amount of punitive damages that should be awarded. This evidence included testimony from several of defendant's corporate officials, an accountant retained by plaintiffs to testify regarding defendant's financial condition, and testimony from plaintiff Ryan Patton. After carefully considering the evidence presented at the hearing and the arguments of the parties, the court is now prepared to determine the amount of punitive damages to be awarded.

The court will analyze the seven factors listed in K.S.A. 60–3702(b). As the plaintiffs note (and the defendant does not dispute) those seven factors, listed below, are also not exclusive. *Fenstermacher v. Telelect,* 1992 WL 100312 (D.Kan.), April 22, 1992.[5] Thus, the court has taken into consideration all of the evidence presented during the trial of this matter as well as the evidence introduced at the punitive damages hearing in arriving at its decision.[6]

### 1. Likelihood at the time of misconduct that serious harm would arise from the defendant's misconduct

The misconduct at issue here is defendant's failure to give a post-sale warning regarding hazards related to its cultivators following its receipt of information that a number of serious accidents had occurred.

Obviously, once defendant received information regarding these accidents, it was clear to defendant that serious harm (including death) was occurring as a result of the design of the cultivator. The question, then, is what serious harm was likely to occur in the future due to defendant's failure to give a post-sale warning? The court finds the answer to this question problematical.

Defendant argues that a warning would not have been effective since the defective cultivators would still be in the field and users, whose habits were ingrained, would continue to operate the cultivators in the same manner and serious injuries would continue to occur at the same rate. Plaintiffs, on the other hand, argue that if a specific warning program had been implemented by defendant, it would have heightened the sensitivity of cultivator users to the dangers inherent in the cultivator and caused them to modify their behavior. For example, since the accidents occurred when users pulled the lock pin under the mistaken impression that the cylinder was providing hydraulic pressure, and one of the common situations where a lack of hydraulic pressure would result was during the changing of a cylinder, a specific warning relating the dangers and instructing users to always keep the cultivator wings down when changing the hydraulic cylinder could very well have been effective in preventing injuries.

The court believes that the *main* cause of the accidents was the defective design of the cultivator. However, the court also believes that even if it would not have had a *certain* preventative effect, an aggressive post-sale warning program by TIC *could* have reduced the likelihood of harm. The jury, moreover, did find that the failure to warn was the predominate cause of the harm suffered by these plaintiffs. On balance, this factor

---

disregard for it. The evidence in the case supports that finding.

5. The court here specifically takes into account in its decision the forty percent contingent fee contract between plaintiffs and their attorneys and the approximately $100,000.00 in litigation expenses incurred.

6. The plaintiff suggests that the court consider the reasonableness of a multiplier of actual dam-

ages such as they have drawn from the awards in other punitive damage cases. The court notes, in that regard, that in *Fenstermacher* the punitive award was approximately one-half the actual damages while in *Weathers v. American Family Mut. Ins. Co.,* 793 F.Supp. 1002 (D.Kan.1992), another case involving a punitive damages award by Judge O'Connor, the ratio was very similar to the one which results here in this case.

weighs against the defendant to a significant degree, albeit less so than if the efficacy of a post-sale warning program were more clear.

### 2. Degree of the defendant's awareness of that likelihood

As discussed above, defendant contends that it did not believe a post-sale warning would be effective in preventing injuries from occurring. Defendant's key employee for this product, John Kehrwald, testified that he rejected any post-sale warning because he did not believe it would have any effect based on his experience with users of farm machinery. He also testified that he spoke with a representative of John Deere, which had engaged in a warning and retrofit with regard to similar cultivators it had produced, and that representative had told him that their program had been a disappointment. Thus, Mr. Kehrwald believed he was justified in concluding that a post-sale warning would not prevent injuries from occurring.

Even if the utility of a post-sale warning program is a matter for reasonable dispute, the court is especially disturbed by the lack of effort made by defendant to sufficiently evaluate the matter in order to make a reasoned determination as to whether any sort of warning program could, in fact, be effective and should be implemented. Deere was reacting to the dangers of its similar cultivators by aggressively issuing warnings through letters, trade publications and even a retrofit program through its dealer network (which exceeded any duty defendant had here). While the court does not believe the mere fact that Deere had engaged in that type of program meant that defendant was required to, the court does believe that defendant should have done more to attempt to evaluate the effectiveness of Deere's campaign, or of one which it might develop, rather than merely to rely on Mr. Kehrwald's alleged fleeting conversation with the Deere representative. Frankly, the evidence presented by defendant that a warning program was seriously considered or was reasonably rejected based on any degree of engineering or scientific analysis is very thin. This is the most damning of the factors here.

### 3. Profitability of the defendant's misconduct

The court finds this factor negligible. The testimony at the hearing was that it would only cost approximately $110,000.00 to implement a warning program. Also, the court is not convinced that defendant's failure to warn has had much effect one way or the other on defendant's sales of cultivators. Thus, the court does not weigh this factor against the defendant as it would if the failure to warn had been highly rewarding.

### 4. Duration of the conduct and any intentional concealment of it

This factor also does not weigh heavily in the court's determination. The jury did find that, for purposes of determining whether the useful safe life of the cultivator had expired under Kansas law, defendant had fraudulently concealed the defect in the cultivator. However, the court believes this result almost to have been mandated as a matter of logic under the facts of this case by the failure of the defendant to warn of the danger associated with the cultivator. The court does not equate the jury's finding of fraudulent concealment on the safe-life issue with intentional concealment by defendant of the conduct for which punitive damages arise, that is its failure to issue a post-sale warning. There is no evidence that defendant concealed its failure to issue a warning, it simply chose not to give any.

### 5. Attitude and conduct of defendant upon discovery of the misconduct

Defendant made absolutely no effort to engage in any type of post-sale warning program regarding the cultivators until the verdict had been rendered by the jury in this case. Such a delay in action seems consistent to the court with defendant's general position in this case. Defendant, at least in this area, has shown absolutely no inclination willingly to take any safety initiatives with regard to users of their cultivators similarly situated to those who have been injured. The court, of course, finds it preferable that defendant has, at last, generated a program rather than resolutely ignoring all that has transpired. Yet, the salutary effect is significantly watered down by the timing.

### 6. Financial condition of defendant

The court finds from the testimony at the hearing that defendant is financially solvent and operating profitably.[7] Pursuant to K.S.A. 60–3702(e), the punitive damage award cannot exceed $5,000,000.00.

The question of how much of an award must actually be made in order to punish a defendant in this company's financial position is a more difficult call. Nonetheless, the court feels comfortable that the amount awarded here will hurt, but without producing untoward secondary effects.

### 7. Total deterrent effect of other damages and punishment imposed upon the defendant as a result of the misconduct

The only damages incurred by defendant to date for its failure to warn are the compensatory damages awarded by the jury to plaintiffs. Those damages were, however, substantial.

### 8. Summary

In returning its verdict, the jury determined that the plaintiffs had proven, by clear and convincing evidence, that defendant TIC had acted wantonly. The court believes that this finding is supported by the evidence and agrees with the jury that TIC acted in a wanton manner by failing even to attempt to warn of the hazard associated with its cultivators. In fact, the court questions whether the defendant even seriously considered the matter.

Taking into account the evidence introduced at trial and at the punitive damages hearing, the court hereby assesses punitive damages in the amount of $1,000,000.00. All in all, when the totality of appropriate factors is considered, the court believes that this amount represents a significant, and sufficient, award to adequately punish the defendant and to deter it and others from like conduct in the future.

### III. Conclusion

**IT IS, THEREFORE, BY THE COURT ORDERED THAT** defendant's motion for judgment pursuant to Rule 50 (Doc. # 291) is denied.

**IT IS FURTHER ORDERED THAT** the clerk of the court is directed to enter judgment in favor of plaintiffs in the amount of $1,000,000.00 for punitive damages.

**IT IS SO ORDERED.**

---

**7.** The defendant's most recent financial information offered in evidence at trial showed net profit for the year 1993 of over $10 million and a net worth of over $48 million. The evidence also indicated that the defendant is highly leveraged and its assets substantially encumbered.