Ted and Debra SCHEUFLER, husband and wife;  Paul and Elva Scheufler, husband and wife, Harvey Wilhaus;  Alice M. Richmond;  Mabel V. Colle Trust;  Kenneth D. and Eileen P. Knapp, husband and wife;  Peirce Knapp Farms, Inc., by Walter C. Peirce, President;  Violet Stockham, Coll–Mor Farm, Inc. and Lee Scheufler, Plaintiffs,

v.

GENERAL HOST CORPORATION, a New York Corporation, Defendant.

Civil Action No. 91–1053–FGT.

United States District Court, D. Kansas.

Oct. 24, 1995.

Casey R. Law, Bremyer & Wise, P.A., McPherson, KS, H. Lee Turner, H. Lee Turner, P.A., Great Bend, KS, for Ted Scheufler, Debra Scheufler, Paul Scheufler, Elva Scheufler, Harvey Wilhaus, Alice M. Richmond, Mable V. Colle, and Violet Stockham.

H. Lee Turner, H. Lee Turner, P.A., Great Bend, KS, for Kenneth D. Knapp.

Casey R. Law, Bremyer & Wise, P.A., McPherson, KS, H. Lee Turner, H. Lee Turner, P.A., Great Bend, KS, Kenneth E. Peirce, Turner & Boisseau, Chtd., Hutchinson, KS, for Eileen Knapp and Peirce Knapp Farms, Inc.

Thomas D. Kitch, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, William R. Sampson, Bill J. Hays, Paul W. Rebein, Shook, Hardy & Bacon, Overland Park, KS, Rodney Zerbe, Thomas F. Munno, William F. Downey, Dechert, Price & Rhoads, New York City, for General Host Corp.

### MEMORANDUM AND ORDER

THEIS, District Judge.

This is a nuisance action brought by several landowners and some of their tenants who claimed that the groundwater underlying their properties was polluted by salt which escaped from the American Salt plant in Lyons, Kansas, and into the Cow Creek Aquifer. At the relevant time, the salt plant was owned by a wholly owned subsidiary of the defendant, General Host. Trial of this matter resulted in a verdict for the plaintiffs on their claims for lost crop profits resulting from the inability to irrigate. After a verdict was reached on the issue of actual damages, the court held a second phase of trial before the same jury for the purpose of deciding whether punitive damages were appropriate in this case. The jury determined that the defendant is liable for punitive damages.

This is a diversity action in which Kansas substantive law applies. In accordance with K.S.A. § 60–3702(a), the court held an evidentiary hearing on September 11, 1995, to determine the proper amount of punitive damages. The parties presented evidence and argument at that hearing, and the court has had the benefit of numerous pleadings from both sides arguing the merits of the punitive damages issue. The court is now prepared to rule.

In addition to punitive damages, there are matters which the court must address. The parties have reached an agreement as to the actual damage award in this case. (Doc. 397). Also before the court is plaintiffs' motion for costs of proving matters which were the subjects of requests for admissions denied by the defendant. (Doc. 361).

### 1. Actual Damages Stipulation

Some of the tenants who farm the subject properties under sharecropping arrangements were joined as plaintiffs to this action pursuant to Federal Rule of Civil Procedure 17(a). (Doc. 315, Memorandum and Order, July 18, 1995). Other tenants were not joined, however, because the court ruled that they had settled all their claims with the defendant. Because under Kansas law the landowners and tenants each had claims only as to their own shares of the damages, *Binder v. Perkins*, 213 Kan. 365, 516 P.2d 1012 (1973), it became necessary to apportion damages between the landowners and tenants. To that end, the parties reached a stipulation as to how income and expenses from growing irrigated corn would have been divided. The court was prepared to ask the jury to determine the apportionment of damages, but counsel for both sides insisted they could apply the stipulation and reach an agreement as to the division of damages between landowner and tenant and the necessary reduction of damages to account for the settling tenants. In reliance on counsels' assurances, the court redrafted the jury in-

structions and verdict form so that the jury was responsible for apportioning damages by parcel of land.

After trial, neither side agreed with the other's actual damage proposal, and the court ordered both sides to endeavor in good faith to reach an agreement and report the results back to the court. (Memorandum and Order of September 12, 1995, Doc. 382). The parties have now, after consultation with the Magistrate, reached such an agreement and filed the necessary stipulation on October 17, 1995. (Doc. 397). The parties agree that the landowners and the tenants joined as plaintiffs are to be awarded a total of $480,000 in actual damages, with the landowners and tenants each receiving equal shares of the damages for their respective properties. Judgment for actual damages will therefore be entered in accordance with the October 17 stipulation, Document No. 397.

### 2. Motion for Costs

The court turns next to plaintiffs' motion for sanctions under Federal Rule of Civil Procedure 37(c)(2), which provides that a party who denies a request for admission may be liable for expenses, including attorney fees, incurred by the other party in later proving the truth of the matter.

The plaintiffs submitted a request for admission that the plaintiffs were unable to obtain fresh water for crop irrigation due to pollution caused by operations of the American Salt plant. The defendant denied the request except as to the property of Peirce Knapp Farms, Inc. The plaintiff also requested admissions as to each of the properties that but for the pollution, the plaintiffs would be able to irrigate. Again the defendant denied the requests, except as to the Peirce Knapp property. The defendant admitted that, but for the pollution, it would be practical to obtain fresh water on the Peirce Knapp property, but stated that an irrigation permit would be required. The plaintiffs also requested that the defendant admit that the groundwater pollution was caused by operations at the salt plant. The defendant responded by admitting that some contamination of the aquifer had occurred resulting from salt plant operations, but denying that

the entire aquifer was so contaminated. Finally, the plaintiffs requested an admission that any groundwater pollution affecting the plaintiffs' properties was caused by salt plant operations. Again, the defendant admitted the contamination of the Peirce Knapp property, but as to other properties denied either the fact of contamination, that the contamination would prevent irrigation, or that the salt plant was the source of the contamination.

Each of the matters which plaintiff requested defendant admit was proved true at trial, except the jury found that the Paul and Elva Scheufler property was not contaminated in 1993 or thereafter and that the Mabel Colle Trust property was not contaminated in 1994 and 1995.

Rule 37(c)(2) provides in relevant part:

> If a party fails to admit ... the truth of any matter as requested under Rule 36, and if the party requesting the admission thereafter proves ... the truth of the matter, the requesting party may apply to the court for an order requiring the other party to pay the reasonable expenses incurred in making that proof, including reasonable attorney fees. The court shall make the order unless it finds that (A) the request was held objectionable pursuant to Rule 36(a), or (B) the admission sought was of no substantial importance, or (C) the party failing to admit had reasonable ground to believe that the party might prevail on the matter, or (D) there was other good reason for the failure to admit.

This sanction is mandatory unless the court finds that one of the exceptions apply. *Marchand v. Mercy Medical Center,* 22 F.3d 933, 936 (9th Cir.1994); *Herrera v. Scully,* 143 F.R.D. 545, 548 (S.D.N.Y.1992). The court's application of those exceptions is reviewable for abuse of discretion. *Marchand,* 22 F.3d at 936; *Comeaux v. Brown & Williamson Tobacco Co.,* 915 F.2d 1264, 1268 (9th Cir. 1990); *Williams v. State Farm Mut. Auto. Ins. Co.,* 737 F.2d 741, 746 (8th Cir.1984), *cert. denied,* 469 U.S. 1159, 105 S.Ct. 910, 83 L.Ed.2d 923 (1985). The only question in this case is whether the defendant had reasonable ground to believe it might prevail on the relevant matters.

The court agrees with defendant that although it did not prevail on many of the matters involved in the requests, it had reasonable ground to believe it might. The requests dealing with whether salt pollution prevented the plaintiffs from irrigating appear simple at first look, but embrace a number of complicated technical issues, including the depth of the aquifer at a given location, the amount of water necessary for irrigation of crops, the level of pollution, the location of the irrigation well, the distance from which an irrigation well draws water, the concentration of salt which renders water unusable, and the movement and rate of recharge of the aquifer. *See Board of Directors, Water's Edge, a Condominium Unit Owner's Ass'n v. Anden Group,* 136 F.R.D. 100, 106–07 (E.D.Va.1991) (reasonable ground to deny "complex and contested factual matter"). Each of these matters was the subject of a great deal of conflicting expert testimony. The court denied plaintiffs' motions for summary judgment and directed verdict because there was sufficient evidence supporting the defendant's contentions to create a jury question. In fact, as to some properties for some years, the jury found the groundwater suitable for irrigation.

The other requests likewise involve complicated scientific issues about which there is little agreement among the experts. The court finds that the defendant's position on each of these matters had a reasonable basis in evidence, although the jury ultimately found for the plaintiffs on these issues. The court also notes that the defendant's responses were clear and unambiguous and set forth those matters about which there was no dispute. *See Marchand,* 22 F.3d at 937 (defendant's misleading answers as supporting award of costs). The defendant did admit that salt plant operations caused contamination of one subject property and partial contamination of other properties.

In sum, the court finds the defendant had reasonable ground to believe it might prevail on those matters for which it denied requests for admissions. For that reason, the court denies the plaintiff's motion for costs of making proof of requested admissions.

### 3. Punitive Damages

Under Kansas law, punitive damages are permitted in civil cases where the plaintiff proves by clear and convincing evidence that the defendant acted toward the plaintiff with willful or wanton conduct, fraud, or malice. K.S.A. § 60–3702(c). The purpose of punitive damages is to punish the tortfeasor for its wrongful conduct and to deter it and others from similar misconduct. *Smith v. Printup,* 254 Kan. 315, 325, 866 P.2d 985 (1993). The jury has determined that punitive damages are warranted in this case, and the court must now determine what amount is appropriate to serve the purposes of punitive damages.

As an initial matter, the court addresses the defendant's constitutional challenges to the Kansas statute on punitive damages and to its application in this case. The defendant first argues that the Kansas punitive damages statute violates due process in that the terms "willful conduct" and "wanton conduct" are not defined and thus do not provide a jury sufficient guidance to consistently and reasonably decide whether to impose liability for punitive damages. The Supreme Court stated in *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 18, 111 S.Ct. 1032, 1043, 113 L.Ed.2d 1 (1991), that in deciding whether a scheme for determining punitive damages meets the requirements of due process, "[g]eneral concerns of reasonableness and adequate guidance from the court ... enter into the constitutional calculus." Due process is satisfied when the jury's discretion is exercised within reasonable constraints. *Id.* at 19, 111 S.Ct. at 1044.

Whether the terms about which defendant complains are sufficiently intelligible standing alone, the court concludes that in light of the jury instructions defining willful conduct and wanton conduct, as well as clear and convincing evidence, the jury was sufficiently limited in its discretion. *Weathers v. American Family Mut. Ins. Co.,* 793 F.Supp. 1002, 1026–27 (D.Kan.1992). The court notes in this regard that the jury instructions given were those the defendant proposed. As in *Weathers,* the jury in this case was instructed on the purpose of punitive damages and was made to understand that punitive dam-

ages were not mandatory. *Haslip,* 499 U.S. at 19, 111 S.Ct. at 1044; *Weathers,* 793 F.Supp. at 1027.

Furthermore, the jury's discretion is substantially limited by the Kansas statute's requirement that the amount of punitive damages be fixed by the court in a separate proceeding. *See id. See also Haslip,* 499 U.S. at 20–21, 111 S.Ct. at 1045 (discussing Alabama's post-trial procedure for state supreme court review of punitive damage award). The Kansas punitive damages statute reasonably accommodates a defendant's interest in rational decisionmaking. *Id.* at 19–20, 111 S.Ct. at 1044. Therefore, the statute complies with due process.

■ This defendant was assessed punitive damages of $10,000,000 in the case of *Miller v. Cudahy Co.,* 592 F.Supp. 976 (D.Kan.1984), *aff'd in part, rev'd in part on other grounds,* 858 F.2d 1449 (10th Cir.1988), *cert. denied,* 492 U.S. 926, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989), which involved the same salt pollution, but different plaintiffs and different properties. The court rejects the defendant's argument that multiple awards of punitive damages based on the same conduct necessarily violate due process. This argument was addressed and rejected in *McDermott v. Kansas Public Serv. Co.,* 238 Kan. 462, 464–67, 712 P.2d 1199 (1986). The defendant's due process rights are adequately protected by K.S.A. § 60–3702(b)(7), which makes the deterrent effect of prior punitive damage awards a mitigating factor in assessing punitive damages. *See U.S.D. No. 490 v. Celotex Corp.,* 6 Kan.App.2d 346, 355, 629 P.2d 196 (1981). The jury in this case was informed of the prior punitive damage award and was asked to determine whether further punitive damages would be appropriate. At any rate, this case involves some wrongful conduct which occurred after the *Miller* trial in addition to the original pollution of the aquifer.

The court must now apply the punitive damages statute, K.S.A. § 60–3702, to determine the appropriate measure of punitive damages for this case. The Kansas statute provides that no punitive damage award shall exceed the lesser of the defendant's annual gross income (or one half of the defendant's net worth if the defendant's annual gross income is determined to be a clearly inadequate penalty) or $5,000,000. K.S.A. § 60–3702(e)(1) and (2). The defendant's annual gross income is the defendant's highest gross annual income earned for any one of the five years immediately before the act for which such damages are awarded. K.S.A. § 60–3702(e)(1). In this case, both the defendant's annual gross income as determined according to the statute and one half of the defendant's net worth greatly exceed $5,000,000. Thus, $5,000,000 is the applicable statutory cap under subsection (e).[1]

■ K.S.A. § 60–3702(b) lists seven factors the court may consider in determining the amount of punitive damages to be awarded:

"(1) The likelihood at the time of the alleged misconduct that serious harm would arise from the defendant's misconduct;

(2) the degree of the defendant's awareness of that likelihood;

(3) the profitability of the defendant's misconduct;

(4) the duration of the misconduct and any intentional concealment of it;

(5) the attitude and conduct of the defendant upon discovery of the misconduct;

(6) the financial condition of the defendant; and

(7) the total deterrent effect of other damages and punishment imposed upon the defendant as a result of the misconduct, including, but not limited to, compensatory, exemplary and punitive damage awards to persons in situations similar to those of the claimant and the severity of the crimi-

---

1. K.S.A. § 60–3702(f) states that the court may award up to one and one half times the amount of profit which the defendant gained or is expected to gain as a result of the misconduct. Because the misconduct involved in this case consisted of cost-cutting measures, it must have resulted in some increased profit. However, the court has no information on which to base a determination of what profit the defendant gained by its misconduct. In fact, the only evidence on the subject was the plaintiffs' expert's testimony that § 60–3702(f) does not apply in this case.

nal penalties to which the defendant has been or may be subjected."

This list is not exclusive. *Patton v. TIC United Corp.,* 859 F.Supp. 509, 513 (D.Kan. 1994); *Ruiz v. Quiktrip Corp.,* 826 F.Supp. 1284, 1285 (D.Kan.1993).

The defendant argues that any evidence relevant to the first five factors which the court considered in assessing punitive damages in the *Miller* case should not be considered at all in this case. The court disagrees. The Kansas punitive damages statute does not prohibit multiple punitive damage awards for the same misconduct, *see McDermott,* 238 Kan. 462, 712 P.2d 1199, and does not require the court to ignore relevant factors when they have been considered in a previous case. The statute does address defendant's concern by listing as a factor the deterrent effect of other damage awards. K.S.A. § 60–3702(b)(7). As discussed below, the court agrees that the prior award of punitive damages is an important consideration in this case.

Although the court has considered each of the first five factors, the court need not detail the evidence regarding the defendant's misconduct which appears in the 1984 *Miller* decision. A brief overview of that evidence will suffice.[2] The American Salt plant in Lyons, Kansas was owned by a wholly owned subsidiary of General Host from 1971 to 1988. American Salt was in the business of mining and processing salt. Salt mining, solution mining in particular, is an activity which poses a great danger to the environment if not undertaken with care. The defendant, fully aware of the harm it would cause, chose to maximize profits by failing to perform routine maintenance of its plant and equipment. The plant, plant equipment, and pipelines were allowed to deteriorate to the point where incidents of pollution were commonplace. Intentional dumping of solid salt and brine also took place. Otto Rueschoff,

American Salt's president during the relevant time frame, displayed complete disregard for the rights of surrounding landowners. When confronted with the complaints of neighboring landowners, Rueschoff employed a strategy of intimidation. The defendant was aware of, and ratified, Rueschoff's conduct. The cost-cutting measures and the harm they caused were foreseeable consequences of the defendant's intense pressure on the management of the salt plant to deliver constantly increasing profits. Finally, the defendant engaged in acts of concealment and intentional misrepresentation regarding pollution of the aquifer.

Also relevant to each of the first five factors listed in the statute is that the defendant continued to pollute the aquifer during the four years following the *Miller* trial. The parties have stipulated that no significant additional pollution has occurred since 1988. The court believes that the additional pollution warrants some additional punishment, but recognizes that the level of misconduct since 1984 is minor compared to the misconduct before that time.

As a result of the operations of the American Salt plant, somewhere between 150,000 and 325,000 metric tons of salt had escaped into the Cow Creek Aquifer by 1984. Salt concentrations reached as high as 30,000 parts per million, leaving the water unsuitable for domestic or agricultural use. But for the salt pollution, the water in the aquifer could be used for growing irrigated corn. Although clean-up efforts have been under way for a number of years,[3] it could be decades before the water is again suitable for irrigation. In sum, the relevant conduct by the defendant in this case was intentional and caused extreme harm to both private and public interests which could have been avoided by reasonable measures.

---

**2.** Any person interested in more information is directed to the court's opinion in *Miller v. Cudahy,* 592 F.Supp. 976 (D.Kan.1984), and in particular, Findings of Fact paragraphs 109 to 129, 137, 143, 145–154 and Conclusions of Law paragraphs 9 and 26 to 32. These paragraphs involve matters established by collateral estoppel and were read to the jury, with some slight modifications to avoid any unfair prejudice, during the punitive damages phase of the trial of this matter.

**3.** The defendant has been in consistent compliance with the clean-up order imposed by the Kansas Department of Health and Environment in 1987.

As for the attitude of the defendant, the court received evidence that in March 1995 the defendant, on its own initiative, committed to constructing and operating an additional interceptor well when the defendant learned that the interceptor wells already in place were not catching all the contaminated water. The court rejects plaintiffs' argument that such evidence is inadmissible under the Tenth Circuit's holding in *O'Gilvie v. International Playtex, Inc.*, 821 F.2d 1438 (10th Cir.1987), *cert. denied*, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 601 (1988). In that case the court held that post-trial conduct which has no relevance to the injurious conduct for which punitive damages are claimed cannot be the basis for reducing a punitive damage award. *Id.* at 1450. Here, the court is asked to consider the defendant's pretrial commitment to remedy problems in the clean-up program rather than its post-trial conduct of actually installing the well. Furthermore, the plaintiffs claim punitive damages for a course of injurious conduct, namely the defendant's denying responsibility for the pollution and stalling on any efforts at remediation, which they contend continues to this day. The defendant's recent action is relevant to that claim. The evidence was therefore properly admitted.

Nevertheless, the court finds that while the defendant's action, taken more than ten years after the *Miller* trial and shortly before trial of this case, may show some change in attitude on the part of the defendant, it comes too late in the game to mitigate significantly the effects of the defendant's past conduct. *See Patton*, 859 F.Supp. at 514 ("[T]he salutary effect [of defendant's remedial action] is significantly watered down by the timing."). The evidence of the defendant's commitment to add an interceptor well is not a factor which weighs heavily in the court's assessment of punitive damages.

The court now turns to the sixth factor, the defendant's financial condition. Tom Dechant, an accountant, testified as an expert witness for the plaintiffs on this issue. Dechant had reviewed the annual reports and other financial information about General Host. Dechant testified that the defendant's net worth between 1984 and 1994 ranged from $109,000,000 to $234,000,000, which was lower than the company's annual gross income. The annual gross income came very near or exceeded $400,000,000 in each of the years from 1984 to 1994. Dechant testified over the defendant's objection that K.S.A. § 60–3702(e) rather than § 60–3702(f) applies in this case. Dechant testified that much of General Host's income since 1984 has come from the sale of operating divisions. In fact, without considering revenue from the sale of operating divisions, the company has experienced a net loss of nearly $100,000,000 over the last ten years. At the time of the *Miller* decision, General Host had nine operating divisions. In 1995, the company has one operating division, a chain of Christmas tree farms/craft stores in the Midwest. General Host sold the American Salt Company in 1988, recognizing no gain on the sale. The company's net worth is less than sixty percent of what it was in 1984, and the value of its stock has dropped substantially. Dechant expressed the opinion that General Host now "bears no resemblance to the corporation in *Miller*."

The seventh factor listed in the statute is the deterrent effect of prior damage awards and punishment. This is a highly significant factor in this case. In *Miller*, the defendant was held liable for actual damages of $3,060,-000 and punitive damages of $10,000,000, plus post-judgment interest. At the time it assessed punitive damages, the court was aware of the far-reaching impact of the pollution of the aquifer by the defendant, and the effects it would have as the aquifer flowed downstream. *Miller*, 592 F.Supp. at 999. The defendant has also paid over $5,000,000 to settle the claims of other landowners in the time period since *Miller*. The clean-up program has cost the defendant an additional $4,000,000.

■ Having considered the foregoing factors, and keeping in mind that punitive damages are designed "to sting, not to kill," *McDermott*, 238 Kan. at 462, syl. ¶ 2, 712 P.2d 1199, the court believes that the punitive damage award in this case should be meaningful, but, statutory cap aside, should not approach the award in the *Miller* case. The court believes that a punitive damage

award of $550,000 will best serve the goals of punishment and deterrence.

In preparation for the punitive damages hearing, the court asked the parties to provide the following information:

the plaintiffs' fee arrangement with their attorneys; the expenses and fees plaintiffs have incurred in pursuit of this litigation, excluding those which will be taxed as costs; the normal hourly rate charged by plaintiffs' attorneys in major cases; the defendant's attorneys' hourly rates in this case; and the number of hours expended by counsel for all parties on the appeal to the Tenth Circuit Court of Appeals in *Miller v. Cudahy*.

(Doc. 366, Memorandum and Order of August 25, 1995).

Both sides have fully complied with the court's order, although the defendant objected to providing its attorney fee information. (Doc's 371, 372, 380, 389). The plaintiff's belief that the defendant has failed to provide the information the court requested (Doc. 392, Plaintiffs' Objection to Defendant's Response) represents a misunderstanding of the court's order.[4] It appears that this misunderstanding and the defendant's objection stem from an erroneous assumption that the court intends to punish the defendant for having defended this case and the *Miller* case. Actually, it was the court's intention to gather the information necessary to calculate the plaintiffs' attorney fees and expenses in this case, a factor which is properly considered in assessing punitive damages under Kansas law. *Ruiz*, 826 F.Supp. at 1287. *See also Patton*, 859 F.Supp. at 513 n. 5. As it happens, much of the information the parties provided is not necessary to a determination of the plaintiffs' litigation expenses because the court has been informed that the plaintiffs have a forty percent contingent fee agreement with their attorneys. In addition

to attorney fees, the plaintiffs have incurred expenses of approximately $180,000.[5] As discussed above, the parties have stipulated to a total actual damages award of $480,000. Thus, the court knows, without having considered the other attorney fee information the parties have provided, that a punitive damage award of $550,000 will leave the plaintiffs approximately whole but will do little more than that.[6]

The plaintiffs argue that the court should consider the defendant's litigation expenses as a factor supporting greater punitive damages. The court disagrees. The court has already considered the defendant's financial condition and the litigation expenses of the plaintiffs. To consider the defendant's litigation expenses would not only serve to double count the defendant's financial status, but would also implicate the relative size of the parties, which is not a proper factor under the Kansas statute. *Ruiz*, 826 F.Supp. at 1287–88. Moreover, the court does not believe that appealing the *Miller* decision or litigating this case is evidence of an improper attitude on the part of the defendant, as plaintiffs have suggested. In that regard, the defendant has done no more than exercise its legal rights, and this court has no interest in punishing it for doing so. There were genuine issues of fact for the jury to decide in this case. In fact, the jury's verdict indicates that the jury accepted the defendant's position on some of these matters. Whether settling these claims would have saved the defendant some expense is a matter of business judgment and one with which this court need not be concerned.

Having considered all the factors listed at K.S.A. § 60–3702(b), the evidence presented at trial and at the punitive damages hearing, and the parties' submissions on the issue, the court assesses punitive damages in the amount of $550,000. The court believes that this amount best serves the purpose of pun-

---

4. Plaintiff argues that the defendant disobeyed the order by failing to inform the court of hours spent in post-trial proceedings at the district court level in *Miller* and its attorneys' hourly rates for the *Miller* appeal to the Tenth Circuit. In fact, the court requested only the number hours spent on the appeal of *Miller* to the Tenth Circuit.

5. Although the plaintiffs have represented their expenses to be approximately $160,000, the court is aware, due to a dispute over taxation of costs, that plaintiffs' expenses may exceed $180,000.

6. A total award of $1,030,000 less $180,000 in expenses leaves $850,000, $340,000 of which would go to the plaintiffs' attorneys. The plaintiffs, then, would take home $510,000.

ishment and deterrence. The court recognizes that most, if not all, of the punitive damage award will go toward paying expenses and attorney fees. Accordingly, the court has not calculated the division among the plaintiffs. After paying expenses and attorney fees, any remaining amount of punitive damages shall be divided equally by parcel of land, with those tenants who are plaintiffs in this action sharing equally with their respective landowners.

Any remaining arguments by the parties not specifically addressed in this opinion have been considered and rejected rather than overlooked.

**IT IS BY THIS COURT THEREFORE ORDERED** that the clerk of the court is directed to enter judgment in favor of the plaintiffs for actual damages, according to the stipulation filed on October 17, 1995 (Doc. 397), in the following amounts:

| | |
|---|---|
| Ted and Debra Scheufler | $ 62,170.53 |
| Paul and Elva Scheufler | $ 20,512.03 |
| Mabel v. Colle Trust | $ 42,903.10 |
| Harvey Wilhaus | $109,707.70 |
| Alice Richmond | $ 33,117.68 |
| Kenneth and Eileen Knapp | $ 27,812.02 |
| Peirce Knapp Farms, Inc. | $ 27,384.13 |
| Violet Stockham | $ 30,807.15 |
| Lee Scheufler | $ 82,682.56 |
| Coll–Mor Farm, Inc. | $ 42,903.10 |

**IT IS FURTHER ORDERED** that the clerk of the court is directed to enter judgment in favor of the plaintiffs in the amount of $550,000 for punitive damages, any remainder after payment of the plaintiffs' individual and collective expenses and attorney fees to be divided equally by parcel of land, with landowner and plaintiff-tenant sharing equally.

**IT IS FURTHER ORDERED** that plaintiffs' motion for costs of making proof of requested admissions (Doc. 361) is hereby denied.

**IT IS FURTHER ORDERED** that plaintiffs' motion to compel (Doc. 362) is moot.